## No. 14,547.

DIKEOU ET AL. *v.* FOOD DISTRIBUTORS ASSOCIATION.

(108 P. [2d] 529)

Decided November 12, 1940.   Rehearing denied December 23, 1940.

Mr. E. V. HOLLAND, Mr. MAX ZALL, for plaintiffs in error.

Messrs. QUIAT, GINSBERG & CREAMER, for defendant in error.

*En Banc.*

MR. JUSTICE OTTO BOCK delivered the opinion of the court.

THE question here presented is whether plaintiffs in error, to whom we will herein refer as defendants, wholesalers in the tobacco business, sold cigarettes below their cost, with intent to injure competitors and destroy competition, in violation of chapter 261, Session Laws of 1937, designated as the Unfair Practices Act. The trial court found that they did, and accordingly entered a decree and judgment enjoining them from such further practices. Defendants, seeking reversal, have sued out a writ of error. The pertinent sections of the act here involved are as follows:

"Section 3. It shall be unlawful for any person, partnership, firm, corporation, joint stock company, or other association engaged in business within this State, to

sell, offer for sale or advertise for sale any article or product, or service or output of a service trade for less than the cost thereof to such vendor, or give, offer to give or advertise the intent to give away any article or product, or service or output of a service trade for the purpose of injuring competitors and destroying competition and he or it shall also be guilty of a misdemeanor, and on conviction thereof shall be subject to the penalties set out in Section 11 of this act for any such act.

"(a) The term 'cost' as applied to production is hereby defined as including the cost of raw materials, labor and all overhead expenses of the producer; and as applied to distribution 'cost' shall mean the invoice or replacement cost, whichever is lower, of the article or product to the distributor and vendor plus the cost of doing business by said distributor and vendor.

"(b) The 'cost of doing business' or 'overhead expense' is defined as all costs of doing business incurred in the conduct of such business and must include without limitation the following items of expense: labor (including salaries of executives and officers), rent, interest on borrowed capital, depreciation, selling cost, maintenance of equipment, delivery costs, credit losses, all types of licenses, taxes, insurance and advertising."

"Section 5. In any injunction proceeding or in the prosecution of any person as officer, director or agent, it shall be sufficient to allege and prove the unlawful intent of the person, firm or corporation for whom or which he acts. Where a particular trade or industry, of which the person, firm or corporation complained against is a member, has an established cost survey for the locality and vicinity in which the offense is committed, the said cost survey shall be deemed competent evidence to be used in proving the costs of the person, firm or corporation complained against within the provisions of this act."

"Section 10. Any person, firm, private corporation or municipal or other public corporation, or trade association, may maintain an action to enjoin a continuance of any act or acts in violation of sections 1 to 7, inclusive, of this Act and, if injured thereby, for the recovery of damages. If, in such action, the court shall find that the defendant is violating or has violated any of the provisions of sections 1 to 7 inclusive, of this Act, it shall enjoin the defendant from a continuance thereof. It shall not be necessary that actual damages to the plaintiff be alleged or proved. * * *."

■ ■ The constitutionality of the act is not challenged either in the briefs or assignments of error. Substantially similar acts have been held by four state supreme courts not to be in violation of federal and state due-process-of-law clauses. *Wholesale Tobacco Dealers v. National Candy & Tobacco Co.,* 11 Cal. (2d) 634, 82 P. (2d) 3; *Associated Merchants v. Ormesher,* 107 Mont. 530, 86 P. (2d) 1031; *Rust v. Griggs,* 172 Tenn. 565, 113 S. W. (2d) 733, 86 U. of Pa. L. Rev. 780; *State v. Langley,* 53 Wyo. 332, 84 P. (2d) 767. It has been said that the true purpose of acts of this character was to eliminate destructive price competition and the economic effect of the sale of "loss leaders." It also has been argued that free competition may as easily be destroyed by the unfair practices of below-cost selling as by combinations in restraint of trade. Whether such arguments are sound or such legislation is wise or unwise, is solely a problem for the lawmakers. It is not necessary to cite the numerous authorities which have so held.

■ The first contention of counsel for defendants is that defendant in error, which we hereafter designate as plaintiff, lacks the legal capacity to institute and maintain this action, which may be brought under section 10, supra, by "any person, firm, private corporation or municipal or other public corporation, or trade association." Plaintiff is a nonprofit corporation organized under our laws, particularly chapter 41, section

174, '35 C. S. A., the pertinent part of which is as follows: "Corporations, associations, and societies (not for pecuniary profit) founded under this chapter, shall be bodies corporate and politic by the name stated in such certificate, and by that name they and their successors shall and may have succession, and shall be persons in law capable of suing and being sued; * * *." This is sufficient authorization for the maintenance of this action, whether plaintiff be classed as a private corporation or an association. There is no merit to this contention.

■ There is no dispute concerning the price at which the cigarettes were sold by defendants, or the cost price to them as fixed by the manufacturer. The controversy arises primarily over the question of "cost of doing business," within the meaning of the act. The term "cost," as applied to distribution, is defined in the act as "the invoice or replacement cost, whichever is lower, of the article or product to the distributor and vendor plus the cost of doing business by said distributor and vendor." It is this plus item with which we here are largely concerned. The validity of sales of popular brands of cigarettes, such as Camels and Luckies, to the retail trade, under a cash-and-carry arrangement, at $1.12 per carton, is challenged. The invoice cost to defendants was $1.25 per carton, less a ten per cent trade discount, making the invoice price $1.125. If there was payment within ten days, there was a cash discount of two per cent, making the cost price per carton $1.1025. The same cash discount was enjoyed by all competitors. This item of cash discount was challenged by plaintiff as not permissible in figuring the cost of the article sold. The evidence shows that this item of cash discount in accounting practice is generally regarded as a financial management income, not a reduction of the cost of goods, but as a compensation for interest on borrowed money, interest on invested capital and, to some extent, an offset against credit losses. Of course, if the two per cent

discount is deducted from the cost it could not be treated as income. Defendants at the trial did not disclose their bookkeeping methods by presenting their books and showing therefrom how the two per cent cash discount was treated. All they did, for the purpose of the trial, was to introduce a survey covering the period from January 1 to February 10, 1939, which did not reflect their bookkeeping methods, and was admittedly in conflict therewith. Whether there are any merits to the contentions of the parties relative to this item, since this is a comparatively recent law and still in the experimental stage, out of an abundance of caution, we presume, for the purposes of this case only, that the cash discount item should be credited to the cost price of the article, which in this event is $1.1025 per carton. Our next problem is to add to this item the "cost of doing business," in order to determine the full cost, under which defendants were forbidden to sell. If the "cost of doing business," plus the purchase price paid the manufacturer, is a fraction less than the sale price of $1.12 per carton, the sale would not be below cost. It is asserted by defendants that the "cost of doing business" in their cash-and-carry department was 1.13 per cent. They add to this the cost of the article, $1.1025, which makes the total cost $1.1138, leaving a margin of profit of .0062. If this evidence deserves credence, defendants were not selling cigarettes below cost. The trial court found otherwise. Was this finding sustained by the evidence? We think it was. This evidence is predicated solely upon a survey made by a registered accountant, not by a certified public accountant, of the business of defendants for the period before mentioned. The business is conducted on a fiscal period commencing June 1 and ending May 31. During the fiscal year, May 31, 1937, to May 31, 1938, this accountant made at least four financial statements for defendants, but none of them was placed in evidence at the trial. In these statements he did not break down the business into serv-

ice and cash-and-carry departments. Neither the books of defendants nor the departments were separated in that way. At the time of trial, in March, 1939, he had not filed an income report for the fiscal year ending May 31, 1938, although it would be ready within the next few days. His survey was based on a theoretical separation of the service and cash-and-carry departments, although no such actual separation of the business existed. Based upon gross income, he allocated to the service department eighty per cent and to the cash-and-carry department twenty per cent on the total "cost of doing business." Relative to the survey for the period between January 1 and February 10, 1939, he testified on cross-examination that this survey was prepared for the purposes of this case only, and he declined to say that the facts as found would be good for the entire year. He admitted errors in the survey, in failing to charge to the cash-and-carry department any part of the advertising cost, truck expense and truck depreciation. He admitted that he did not allocate to the cash-and-carry department twenty per cent of the total cost of doing business as applied to office salaries, executive salaries and lighting expense. He admitted that although cash-and-carry sales for the period amounted to twenty-six per cent, he used twenty per cent as being cash-and-carry in the apportionment of the expense. No records of any kind were kept to show the actual expense of the theoretically separated departments. Other inconsistencies and discrepancies appear in the evidence, and although a number of errors materially affecting his computations as to the cost of doing business were admitted, no attempt was made to correct them. That this survey was clearly theoretical and arbitrary is disclosed by the record. It was entitled to very little weight in the determination of the "cost of doing business" within the meaning of that phrase as used in the act. In opposition to this testimony, the following appears in the record: Defendants

were, and still are, members of the National Tobacco Distributors Association. One of the defendants, a member of the partnership, was president of the Colorado division of this association, and as such he sent a letter, dated April 2, 1938, to the Colorado distributors, in which he refers to a survey taken by this group, stating therein: "Based on a survey of a number of financial statements of the wholesale tobacco distributors of Colorado we ascertained that the minimum average cost of doing business is 4%." It was urged in this letter that distributors conform to this law. There is no evidence that the cost of doing business has decreased since April 2, 1938. This same association, a week prior to the trial, made another survey of the cost of doing business by wholesale tobacco dealers in Denver, and at a subsequent meeting arrived at a cost of doing business for Denver and vicinity of three per cent of gross sales for delivered merchandise and two per cent for cash-and-carry merchandise, based upon this survey, which disclosed that these adopted percentages were based upon the minimum cost of doing business by any distributor in this vicinity.

Counsel for defendants cite the case of *Associated Merchants v. Ormesher, supra,* as authority on the meaning of the term "cost" under a similar act. It was urged in that case that under the statute, definitions of the terms used were too vague and indefinite to afford a proper basis for a determination of the "cost of doing business" so as to satisfy constitutional requirements. In passing upon this question the court approved the following language from the opinion in *State v. Langley, supra:*

"Hence, in the absence of provisions to the contrary, we must presume that the legislature did not intend to prescribe that the cost must be absolutely exact, and that it must be based upon the precise method of accounting which any one merchant might adopt, but meant, by 'cost,' what business men generally mean,

namely, the approximate cost arrived at by a reasonable rule. Hence, if a particular method adopted by a merchant cannot, under the facts disclosed, be said to be unreasonable, and does not disclose an intentional evasion of the law, the method so adopted should be accepted as correct. In other words, all that a man is required to do under the statute is to act in good faith. Hygrade Provision Co. v. Sherman, 266 U.S. 497, 69 L. Ed. 402, 45 Sup. Ct. 141. In that view of the case, the standard set by the legislature is virtually reduced to one of 'reasonableness.' And it is held that 'reasonableness' as 'a standard of an act, which can be determined objectively from circumstances, is a common, widely-used, and constitutionally valid standard in law.' People v. Curtiss (Cal. App.), 300 Pac. 801, 805, and cases cited." This, in our opinion, is a fair statement and meets with our approval.

There is no contention here that the cost must be absolutely exact. Good faith, however, is necessary. The evidence warrants a finding of lack of good faith in the instant case. This involves also the reasonableness of the theoretical separation of the service department and the cash-and-carry department in ascertaining the cost of doing business. This separation is seriously challenged by plaintiff. The Montana case cited above holds that what is meant by "cost" is "what business men generally mean, namely, the approximate cost arrived at by a reasonable rule."

Plaintiff produced a certified public accountant who had had twenty years experience in a wholesale tobacco business and with other business firms in Denver, whose testimony is not seriously controverted. It is to the effect that since there was no actual separation of the two departments, and no separate account kept of each department, the survey submitted by defendants is theoretical and arbitrary, and does not produce an accurate department division of the business, where, as here, it was carried on under one roof, with one single inven-

tory, with no attempt at separation of the merchandise, and employees serving all customers, whether cash-and-carry or not. In his opinion, the method of allocating cost, by the accounting of defendants, was not according to proper and accepted accounting practices; that he would not, as a certified public accountant, nor did he believe would any other certified public accountant, certify such survey as a correct statement of cost. In view of the admitted inconsistencies and discrepancies appearing in the evidence of accountant for defendants, and by reason of the testimony of the certified public accountant who appeared for plaintiff, the court, as trier of the facts, was justified in disregarding this survey of defendants, made under the circumstances above narrated. From this evidence the court also could properly reach the conclusion that the cost of the cash-and-carry department, based on this survey, was not "what business men generally mean, namely, the approximate cost arrived at by a reasonable rule," and that its promulgation was not in good faith. What, then, is defendant's cost of doing business, as derived from the record? The survey made for them does show, taking into consideration their entire sales and the business operated as one unit, 3.3 per cent as the cost of doing business for the period covered. Taking this figure as the overhead expense would make the cost of cigarettes per carton approximately $1.14, or two cents per carton over the selling price. In this situation the court was warranted in finding that defendants were selling cigarettes below cost. If the evidence were undisputed, that defendants were not selling below cost, or if the trial court had so found from the evidence, our problem probably would be different. That this margin is important in the determination of the "cost of doing business" is indicated by the claim of defendants, that under their survey they were making a profit in the cash-and-carry department of .0062. This is not a case in which, owing to the peculiar and favorable circumstances of

a business, such as commercial location, the cost of doing business is a substantial margin lower than exists in the industry generally in the vicinity involved.

■ Counsel for defendants contend that there is no evidence to sustain the findings that the selling below cost was done with the intent to injure competitors or to destroy competition. It is a reasonable inference from the evidence that defendants knew that they were violating the Unfair Practices Act. Their refusal to attend any of the meetings for the purpose of in good faith. reaching an agreement on the cost of doing business, and asserting that they did not think the law could be enforced, indicated an intent not to obey it. They were almost defiant in their attitude not to cooperate in reaching a reasonable cost figure, to be determined by those interested in the industry, on any approximate basis. It may be presumed in a civil action that the natural and probable consequences of the act were intended by the actor. That competitors were injured in their business by the sale of cigarettes at the price fixed by defendants is clearly disclosed by the record. That such unfair practices as selling below cost, under the circumstances, may result in destroying competition also is clear. Where some engaged in an industry attempt to comply with the law while others evade it, fair competition is in jeopardy. The destruction of competition by selling "loss leaders" is generally recognized. Defendants' intent also is evidenced by their actions in calling on firms in the retail trade at the time the reduction was made, which they had not previously, or for some time prior thereto, called upon, and which were not their regular customers, and distributing to them literature calling attention to this reduction. Their activity in advertising their reduction of the sale price made serious inroads in the business of some of their competitors. The effect of such practices upon retailers of cigarettes, in competition with each other, in maintaining fair competition, created a

chaotic market, and demoralized the orderly processes of business. We do not attempt to set out all the evidence relating to this phase of the case, but we think it was sufficient to sustain the findings of the trial court thereon. The very purpose of an act such as this is to prevent ruinous price-cutting, by which the business of competitors might be injured and competition destroyed. *State v. Langley, supra.*

■ The errors assigned to the court's refusal to allow defendants to file an amended answer, and permitting plaintiff to file an amendment to its complaint, are without merit. This pertains to a matter involving the exercise of sound judicial discretion, and there is nothing in the record from which we could say that discretion was abused.

■ Counsel for defendants assign error to the action of the court in overruling their demurrer to the complaint. This ruling was based on the ground that the complaint did not state facts sufficient to constitute a cause of action. Under this assignment, it is urged in the briefs "that the effect of the findings and judgment of the court contravenes section 16 of article II of the Constitution of the state of Colorado." This constitutional section relates to the rights of defendants in criminal cases. We are unable to perceive its relevancy to the findings and judgment of the court in the present case. There is no contention that this is a criminal proceeding. That the effect of injunctive relief in a civil action is different from that following a judgment under a criminal information is clear. The act authorizes either course. That the authorization of the injunctive remedy violates section 16 of article II of our Constitution cannot be successfully maintained. No authority is cited holding that an act such as the one here under consideration violates the constitutional guaranty of trial by jury in criminal cases. That this section may sometimes play a part in the denial of injunctive relief is recognized. The legal basis in *Heber v. Portland G. M.*

Co., 64 Colo. 352, 357, 172 Pac. 12, cited by defendants, is not the same as in the instant case. The trial court did not err in overruling defendant's demurrer on the ground here assigned.

Since counsel for defendants make the assertion that the Unfair Practices Act is a price-fixing law, it should be stated that all the authorities in point hold otherwise. *Associated Merchants v. Ormesher, supra; Wholesale Tobacco Dealers v. National Candy & Tobacco Co., supra; State v. Langley, supra.* Moreover, unlike most laws of this character, enforcement is left to the courts instead of to an administrative board. This should be of interest to those members of the legal profession who favor the judicial method, as a confirmation of their belief, if experience justifies it, that in such procedure more impartiality and fairness will result. The method of its enforcement is, of course, controlled by legislative authority and not by judicial sanction. It should be needless to add that under either method, when there is sufficient evidence, the ruling or judgment will not be disturbed by this court. Only when there is no substantial evidence to sustain the findings within the issues made by the pleadings, is there ground for intervention by an appellate tribunal.

The judgment is affirmed.

MR. JUSTICE BURKE dissents.

MR. CHIEF JUSTICE HILLIARD not participating.