**RED OWL STORES, INC.,**
**petitioner, Respondent,**

v.

**COMMISSIONER OF AGRICULTURE,**
**Appellant.**

**No. 51638.**

Supreme Court of Minnesota.

Sept. 18, 1981.

Phillip Gainsley, Sp. Atty., and Jane A. McTaggart, Minneapolis, for appellant.

Gray, Plant, Mooty, Mooty & Bennett, Curtis D. Forslund, Thomas Darling and John L. Krenn, Minneapolis, for petitioner, respondent.

PETERSON, Justice.

Respondent Commissioner of Agriculture (hereinafter commissioner) appeals from the decision of the district court vacating the commissioner's order which determined that petitioner Red Owl Stores, Inc. (hereinafter Red Owl) had violated the sales-below-cost prohibitions of the Dairy Unfair Trade Practices Act. We reverse.

Red Owl is a retailer of "selected dairy products" as that term is defined in the Minnesota Dairy Industry Unfair Trade Practices Act (hereinafter Dairy Act), Minn. Stat. ch. 32A (1978). In 1975 and 1976, Red Owl advertised and sold selected dairy products, including milk and ice cream, at reduced retail prices in a number of Minnesota communities. During and after these promotion periods, which lasted approximately 1 to 3 weeks, Red Owl's share of the market purportedly increased.

In June and August 1976, the commissioner issued two complaints against Red Owl, contending that it sold, offered and advertised for sale selected dairy products below cost in violation of a provision of the Dairy Act, Minn.Stat. § 32A.04, subd. 1(o) (1978). "Cost," as statutorily defined, includes the invoice cost, without deducting customary cash discounts, plus the cost of doing business. The commissioner estimated that the cost of doing business, based on a store-wide average, was between 20 and 23%. He alleged that Red Owl was selling milk at prices from 5 to 16 cents per gallon below cost and 5-quart pails of ice cream at 26 cents below cost.[1]

At the hearing on the consolidated actions, Robert Thimmesh, the director of the Dairy Practices Division of the Minnesota Department of Agriculture, testified for the commissioner. Mr. Thimmesh indicated that Red Owl's accounting method allocated costs on the basis of percentage of sales. He stated that the vice president and general counsel for Red Owl had told him that the cost of doing business was approximately 22%.

Marvin Babcock and Michael Whitman, grocers in Fairmont, Minnesota, at the time of the alleged violation, who testified on behalf of the commissioner, acknowledged that they had noticed reduced sales in their stores during the time that Red Owl had advertised reduced prices. Mr. Babcock, whose grocery store went bankrupt, asserted that his business failure was due, at least in part, to the fact that Red Owl had lowered prices and lured away customers.

Several officers of Red Owl testified on its behalf, including Paul Nelson, director of grocery operations. Mr. Nelson stated that Red Owl had attempted to institute a program called "Prosper," which assigned costs on a product-by-product basis, but had discontinued it prior to the relevant time period. Dr. Marvin Hayenga, an agricultural economist, also testified for Red Owl. He stated that there were a number of methods of allocating cost. It was his opinion that, because dairy products have a high turnover rate, a lower percentage of overhead costs should be allocated to them.

The hearing examiner found that the cost of doing business with regard to the dairy products could be approximated by allocating a percentage to those products based on their percentage of total store sales. He concluded that Red Owl had sold dairy products below cost, with the purpose of or with the effect of restraining, lessening or destroying competition, in violation of the Dairy Act. The commissioner, adopting the hearing examiner's findings, ordered respondent to cease and desist from further violations.

In determining that the sales made by Red Owl were below cost, the commissioner applied the definition of cost which is referred to by the Dairy Act and which is set forth in Minn.Stat. § 325.01, subd. 5 (1978),[2] as follows:

The actual current delivered invoice or replacement cost, whichever is lower, without deducting customary cash discounts, plus any excise or sales taxes imposed on such commodity, goods, wares or merchandise subsequent to the purchase thereof and prior to the resale thereof, plus the cost of doing business at that location by the vendor;

\* \* \* \* \* \*

The term "customary cash discounts" means "any allowance, not exceeding two

---

1. In calculating the cost, the commissioner did in fact allow a deduction for cash discounts despite the statutory language to the contrary.

2. The relevant provision of the Dairy Act, Minn.Stat. § 32A.04, subd. 1(o) (1978), provides in part:

No manufacturer, wholesaler, distributor or retailer of a selected dairy product engaged in business within this state shall sell, offer for sale or advertise for sale any selected dairy product *below "cost" as that term is defined in section 325.01* or give, offer to give, or advertise the intent to give away any selected dairy product for the purpose or with the effect of violating sections 32A.04, 32A.06, 32A.07, 325.03, and 325.06. (Emphasis added.)

Any further references to the Dairy Act shall relate to this provision as well as section 325.01, which is incorporated by reference.

percent, whether a part of a larger discount or not, made to the wholesale or retail vendor, where the wholesale or retail vendor pays for merchandise within a limited or specified time." Minn.Stat. § 325.01, subd. 6 (1978).

Red Owl asserts that a definition of cost which fails to provide for the deduction of cash discounts forces an overstatement of costs each time a retailer receives such discounts. It argues that, by disregarding cash discounts, the Dairy Act is arbitrary, discriminatory and a violation of due process. However, Red Owl notes that in these cases the commissioner and the hearing officer did, in fact, deduct the discounts in determining costs.

█ We recognize that courts are divided on the issue of whether fair trade statutes, such as the Dairy Act, which exclude deductions for cash discounts, are violative of due process. *Compare Cohen v. Frey & Son*, 197 Md. 586, 80 A.2d 267 (1951), *with Dikeou v. Food Distributors Ass'n*, 107 Colo. 38, 108 P.2d 529 (1940). We need not and do not decide the issue, however, because the act was not applied on that basis. Since Red Owl benefited from the deduction of cash discounts, it cannot now complain that such discounts are not allowed under the terms of the statute.

The commissioner determined that "cost" in this case was equal to the invoice price increased by approximately 20%, which it estimated was Red Owl's "cost of doing business." Minn.Stat. § 325.01, subd. 7 (1978), defines the "cost of doing business" or "overhead expense" as follows:

The "cost of doing business" or "overhead expense" is defined as all current costs of doing business incurred in the conduct of such business and must include, without limitation, the following items of expense: Labor, including salaries and bonuses of executives and officers, rent, depreciation, selling costs, maintenance of equipment, delivery costs, all types of licenses, taxes, insurance, and advertising, and other fixed and incidental expenses.

The hearing examiner found that the commissioner's method of calculating the "cost of doing business," which was based on the ratio of the total store expenses to the total store sales, was reasonable.

It is Red Owl's contention that this procedure was arbitrary and not supported by the statute, because it was not specifically related to the cost of dairy products as opposed to other grocery items. It asserts that cost should be allocated on a product-by-product basis. Since it, like the commissioner, considers this method to be too difficult to be practicable, it contends that the Dairy Act is discriminatory and a denial of due process.

█ We are not convinced that the term "cost of doing business" is so vague as to be completely impractical. The Dairy Act does not require that the cost must be absolutely exact. *Dikeou v. Food Distributors Ass'n*, 107 Colo. at 45–46, 108 P.2d at 533. All that the statute requires is a cost figure arrived at by reasonable accounting standards. *Trade Commission v. Skaggs Drug Centers, Inc.*, 21 Utah 2d 431, 440, 446 P.2d 958, 964 (1968). The commissioner's method appears to be a reasonable, and an enforceable, way of allocating overhead costs to an item, especially in view of the fact that many costs, such as salaries, cannot be tied directly to any particular item. Although Red Owl's expert testified to a number of methods of cost allocation, he agreed that the commissioner's allocation of overhead could be a reasonable method. Red Owl concedes that an attempt to allocate costs on an individual basis is practically impossible, and, indeed, it discontinued its "Prosper" program which was based on that system. Its own accounting method, in fact, sets forth expenses as a percentage of sales.

█ The term "cost of doing business" is therefore sufficiently clear to require compliance with its provisions. *See State v. Langley*, 53 Wyo. 332, 84 P.2d 767 (1938). The constitutionality of the Dairy Act should not depend on questions of inconvenience or difficulty in application of a cost standard. *McElhone v. Geror*, 207 Minn. 580, 292 N.W. 414 (1940); *People v. Kahn*,

19 Cal.App.Supp.2d 758, 60 P.2d 596 (1936). The act is not so vague and indefinite that it violates the substantive requirements of the due process clauses of the Minnesota and federal constitutions.

■ In determining that the statute is constitutional, it is not our role to decide whether the Dairy Act is sound policy or whether it appropriately balances the interest of consumers in low prices and the interest of vendors in fair prices. As the United States Supreme Court recently noted in *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981), it is the role of the legislature to decide the wisdom and utility of this type of legislation. If the question is at least debatable, this court may not substitute its judgment for that of the legislature.

Red Owl argues that the reason for the enactment of the Dairy Act, the mitigation of the hazards of aggressive price competition, no longer exists. However, in *Twin City Candy & Tobacco Co. v. A. Weisman Co.,* 276 Minn. 225, 149 N.W.2d 698 (1967), this court found that the rationale was still valid. We there noted:

> The practice of advertising and selling "loss leaders," or what have been sometimes described as loss "misleaders," has been found by legislatures to result in financially strong companies driving weaker competitors out of business, thereby opening the door to the monopolies which the law is designed to prevent. * * * A further justification for the statute is the likelihood of deception arising from the public's notion that if one item is sold below cost others will be equally cheap, whereas they may actually be exorbitantly high.

*Id.* at 229, 149 N.W.2d at 701–02 (footnotes omitted).

■ The American enterprise system, of course, encourages vigorous competition for patronage as a good for both retailers and consumers. However, the legislature, as a matter of economic regulation, may constitutionally draw the line beyond which certain competitive practices are deemed inimical to a greater public interest. Thus, the conclusion of the legislature that predatory price wars are contrary to the interests of the public and that temporary price advantages may lead to monopoly by large chains is not so irrational as to be contrary to the law or the constitution. *See Flank Oil Co. v. Tennessee Gas Transmission Company,* 141 Colo. 554, 349 P.2d 1005 (1960).

It is also Red Owl's position that the commissioner's decision that it made sales below cost for the purpose or with the effect of injuring competition is not supported by the evidence. It notes that the district court held that the evidence failed to provide a prima facie showing that sales were made by Red Owl below cost with the purpose of destroying competition.

■■ Since we are reviewing the order of an administrative agency, an independent examination of the agency's decision may be conducted by this court without according special deference to the same review conducted by the district court.[3] *Amdahl v. County of Fillmore,* 258 N.W.2d 869 (Minn.1977); *Reserve Mining Co. v. Herbst,* 256 N.W.2d 808 (Minn.1977). Our judgment concerning inferences to be drawn from the evidence should not be substituted for that of the agency. *Ellis v. Minneapolis Commission on Civil Rights,* 295 N.W.2d 523 (Minn.1980). If the record, however, when considered in its entirety does not contain substantial evidence supporting an administrative decision, the agency's ruling must be modified or reversed. *Quinn Distributing Company v. Quast Transfer, Inc.,* 288 Minn. 442, 181 N.W.2d 696 (1970).

■ There is substantial evidence to support the commissioner's determination that sales were made below cost. The fact stipulation shows that the sum of store and allocated expenses as a percentage of sales is 20.03%, approximately the same percentage which was used by the commissioner as

**3.** The district court must consider the findings of the commissioner in cases under chapter 32A to be conclusive as to the facts if supported by the evidence in the proceedings. Minn.Stat. § 32A.09, subd. 5(b) (1978).

the cost of doing business when he calculated the cost of selected dairy items. This stipulation was based on the operating statement prepared by Red Owl. Although Red Owl now claims that the operating statement was used for internal purposes and is not related to cost of doing business, the statement is the best indication of Red Owl's own cost analysis. In addition, Mr. Thimmesh, director of the Dairy Practices Division, indicated that retailers commonly allocate costs on a basis of percentage of sales.

■ Red Owl contends that the commissioner's estimation of the cost of doing business, based on a store-wide percentage of sales, is unreasonable when applied to dairy products. It asserts that because the velocity, or turnover, of dairy items is five times that of grocery items,[4] a store-wide percentage cost is considerably higher than the cost associated with dairy items.

Red Owl's argument regarding the velocity of dairy products bootstraps the issue. The lower the price, the higher the velocity. If Red Owl continued to lower prices, it could eventually claim its overhead cost with respect to these products was negligible, which would render the cost of doing business meaningless. There are also a number of expenses, such as refrigeration and labor, which offset the benefits gained from higher velocity. Thus, the hearing examiner's finding that sales were made below cost, as determined by the commissioner, does not lack evidentiary support.

■ In order for the commissioner to establish a violation under the Dairy Act, there must not only be sales below cost, but they must be with the purpose or with the effect of restraining, lessening or destroying competition or injuring a competitor. Minn.Stat. § 32A.04, subd. 1 (1978), provides in part: "Proof that any person has engaged in any of the trade practices or methods of doing business described in this section shall be prima facie evidence of an intent to violate or that it has the effect of

violating the provisions of this section." This prima facie rule does not shift the burden of proof from the commissioner but it does shift the burden of going forward to Red Owl, since the statute creates a presumption that any sale below cost is done with the prohibited purpose or effect. *State v. Ross*, 259 Wis. 379, 48 N.W.2d 460 (1951). Once Red Owl produced its evidence, the commissioner assumed the ultimate burden of proving the violation. *See Twin City Candy & Tobacco Co. v. A. Weisman Co.*, 276 Minn. 225, 149 N.W.2d 698 (1967).

■ There must be substantial damage to the competitive atmosphere of a retailer's trade area or to a competitor in order to show that there was an intent or effect of injuring competition or a competitor. *State v. Wolkoff*, 250 Minn. 504, 85 N.W.2d 401 (1957). The testimony of grocers that they have lost business to the retailer may be sufficient evidence of injury to competitors. *See People v. Gordon*, 105 Cal.App.2d 711, 234 P.2d 287 (1951).

In *State v. Applebaums Food Markets, Inc.*, 259 Minn. 209, 106 N.W.2d 896 (1960), we decided that no showing had been made that sales below cost were for the purpose or effect of injuring a competitor. The only evidence introduced, however, consisted of affidavits of grocers stating that below cost sales by chain stores generally hurt independent stores. Only one affidavit indicated that the grocer had suffered a percentage drop in business, and no affidavit indicated that the grocer operated a store in the vicinity of any store operated by the defendant or that he had been injured by the defendant.

In this case, Marvin Babcock, who eventually became bankrupt, testified that he had operated a grocery store in Fairmont and that his sales had decreased dramatically during the time that Red Owl had advertised the specials. Babcock indicated that Red Owl's promotion had an effect on his

---

4. This figure was arrived at by Dr. Hayenga by dividing the 75 times per year turnover rate of dairy products by the 17 to 19 times per year turnover rate of other grocery items. He assumed that all other costs remained the same but noted that, in reality, they probably would change, also.

financial condition. Michael Whitman, another Fairmont grocer, testified that he had suffered a loss in his milk business during the period of Red Owl's advertised specials and that many of his customers who were lured away at that time never returned. Evidence was also introduced at trial showing that during the time of the reduced prices, Red Owl had gained an increase in the market share and was able to retain a percentage of these customers after it increased prices.

We conclude that there is strong evidence establishing the diminution of competition as a result of Red Owl's promotions. Further, because the dairy products were "staple" items, and not items that one "stocks up" on, Red Owl cannot argue that the purpose of reduced prices was to increase sales of milk generally in the marketplace. As evinced by its actions, Red Owl's purpose was to increase its own share of the market at the expense of other retailers.

We hold that the decision of the commissioner, based on the hearing examiner's finding that Red Owl sold below cost with the purpose or effect of injuring a competitor or destroying competition, is not without requisite evidentiary support. The order of the district court vacating the commissioner's order is accordingly reversed, and the commissioner's decision ordering Red Owl to cease and desist from further violations of sales below cost as prohibited by Minn.Stat. § 32A.04, subd. 1(o) (1978), is hereby reinstated.

Reversed.