STATE v. LANESBORO PRODUCE & HATCHERY COMPANY.[1]

February 15, 1946.

No. 34,000.

[1]Reported in 21 N. W. (2d) 792.

*J. A. A. Burnquist,* Attorney General, *William C. Green,* Assistant Attorney General, and *Harold C. Lindgren,* County Attorney, for the State.

*John F. D. Meighen* and *Bennett O. Knudson,* for defendant.

MAGNEY, JUSTICE.

Defendant was arraigned on the following information:

"I, Harold C. Lindgren, County Attorney * * * hereby inform the court that * * * at the city of Blue Earth * * * Lanesboro Produce & Hatchery Company, a corporation * * * engaged in the business of buying farm produce, including poultry, with its principal place of business at Wells, Minnesota, did wilfully, wrongfully and unlawfully, in violation of Section 6248-3, Mason's Minnesota

Statutes, Supplement 1940, Minnesota Statutes 1941, Section 17.15, discriminate between different sections, localities, communities, cities and villages of the state of Minnesota by purchasing farm products at a higher price and rate in one locality than was paid for such farm products of the same kind, quality and grade by such corporation in other sections, localities, communities, cities and villages, in that at the time and place aforesaid it did purchase poultry from various and divers persons in the city of Blue Earth, Faribault County, Minnesota, at higher prices and rates than were paid for such poultry by said corporation in Jackson, Sherburn, Lakefield, Alden, and Winnebago, all in the state of Minnesota, after making due allowance for the difference in the actual cost of transportation from the locality of purchase to the locality of manufacture or sale, * * *."

Defendant demurred to the information. The court made no ruling on the demurrer, but, pursuant to Minn. St. 1941, § 632.10 (Mason St. 1927, § 10756), reported the case to this court for decision of the legal and constitutional questions involved and certified the following questions:

"1. Does the law, pursuant to which said information is filed, viz.: 6248-3 Mason's Minnesota Statutes, as amended, being Section 17.15 Minnesota Statutes [1941], violate the provisions of Section 1, of the 14th Amendment to the Constitution of the United States?

"2. Does the said law violate Clause 3 of Section 8, of Article 1, of the Constitution of the United States, which provides that Congress shall have power to regulate interstate commerce?

"3. Does said law violate the provisions of the 5th Amendment to the Constitution of the United States?

"4. Does the said law violate the provisions of Section 7 of Article 1, of the Constitution of the State of Minnesota?

"5. Is said law so vague, indefinite and uncertain that it denies the defendant due process of law, equal protection of the laws and liberty of contract, contrary to the provisions of the Constitution

of the United States and the Constitution of the state of Minnesota?

"6. Does the decision in State v. Northwest Poultry & Egg Co., 203 Minnesota, 438, 281 N. W. 753, render said law unconstitutional as to the crime charged herein by said information?"

■ Under the heading "Assignments of Error," defendant makes this statement:

"* * * the basic contentions of the defendant are: This case comes within the rule of State v. Northwest Poultry & Egg Co., 203 Minn. 438, 281 N. W. 753. The terms of the Statute used to define this class of acts constituting unlawful discrimination are so vague, indefinite and uncertain as to deny due process of law."

Only one question, therefore, is actually presented to this court, and that is whether the statute in question is so vague, indefinite, and uncertain as to deny due process of law.

The material portions of Minn. St. 1941, § 17.15 (Mason St. 1944 Supp. § 6248-3), the statute here involved, read as follows:

"Any person engaged in the business of buying any farm products for manufacture or sale thereof, who shall discriminate between different sections, localities, communities, cities, or villages, * * * in this state, by purchasing any such farm products at a higher price or rate in one locality * * * than is paid for farm products of the same kind, quality, and grade by such person in another section, locality, community, city, or village, * * * after making due allowance for the difference, if any, in the actual cost of transportation from the locality of purchase to the locality of manufacture or sale, * * * shall be deemed guilty of unfair discrimination, which is hereby prohibited and declared to be unlawful."

The statute further provides that it shall not be considered unfair competition to meet the prices of competitors.

L. 1937, c. 420, § 2, amended the act above quoted by adding the following provisions:

"or who shall fail to deduct full transportation costs from the purchase price paid; or who shall fail to deduct the actual costs of hauling when such products are gathered by wagon or truck; * * *."

This amendment to the original act was considered shortly after its enactment, in State v. Northwest Poultry & Egg Co. 203 Minn. 438, 281 N. W. 753 (hereinafter called the Northwest Poultry case), and held unconstitutional. The original act, upon which, the information in the instant case is based, was not considered in that decision. Defendant contends that the above case directly answers in his favor the questions here certified.

The clause "or who shall fail to deduct the actual costs of hauling when such products are gathered by wagon or truck" is the provision which was discussed and held invalid in the Northwest Poultry case, on the ground that it is so vague, indefinite, and uncertain as to deny due process of law. The court, at p. 442 of that case (281 N. W. 755), stated the purpose of enactments of this kind in the following language:

"This statute requires that the 'actual cost of transportation by truck or wagon' be deducted from the purchase price. Exhibited is a clear legislative intent to prevent the destruction of local produce dealers through unfair discrimination by competitors more amply buttressed with capital. Monopolies gained through the misuse of an economic advantage to the direct injury of small merchants and the ultimate injury of producing and consuming classes are to be forestalled. That the police power of the state may be exerted to this end is not to be doubted. State v. Fairmont Creamery Co. 168 Minn. 378, 210 N. W. 163, 608; Central Lbr. Co. v. South Dakota, 226 U. S. 157, 33 S. Ct. 66, 57 L. ed. 164."

In discussing the expression "actual cost," the court said at p. 443 (281 N. W. 756):

"* * * Whether actual cost in this case is limited to gasolene or whether it extends to depreciation, license fees, insurance, repairs, the wages of the driver, or the actual worth of the services of an operator if driven by the owner is not stated. The statute neither

provides which items comprise the actual cost of transportation nor how they are to be computed *as to one trip,* nor yet how the total is to be apportioned if several purchases are collected from a number of producers located varying distances from the point of manufacture or sale *in the course of one trip.* No intent is apparent from a reading of the statute by which these questions can be solved.

"\* \* \* But as to the particular case alleged we are compelled to hold that the terms used to define this class of acts constituting unlawful discrimination are so vague, indefinite, and uncertain as to deny due process of law." (Italics supplied.)

Mr. Justice Stone, in a dissenting opinion, concurred in by Mr. Justice Peterson, said at p. 444 (281 N. W. 756) :

"\* \* \* The transportation of goods by automobile is no longer new. Competent accountants, experienced in that field, certainly may reduce cost of transportation by truck to something equivalent to the ton-mile or passenger-mile basis so familiar in railroad accounting. \* \* \*

"That is not uncertain or vague which by the orderly processes of litigation can be rendered sufficiently definite and certain for purposes of judicial decision. Hence my submission is that the statute here involved is constitutional because its criteria of legal action are susceptible of reasonably certain and just application to facts presentable by evidence."

As stated, in the Northwest Poultry case the clause of the statute held invalid made unlawful as unfair discrimination the failure "to deduct the actual costs of hauling when such products are gathered by wagon or truck." That seems to imply that the dealer must deduct from each individual purchase the actual costs of hauling. The court makes the statement in that case that the statute there considered does not provide which items comprise the actual cost and how they are computed "as to one trip," nor how the total is to be apportioned where several purchases are made from a number of producers located at various distances from the point of manufacture or sale "in the course of one trip." The clause here ques-

tioned makes it unlawful as unfair discrimination to discriminate between different sections, localities, communities, cities, or villages by purchasing farm products at a higher price in one locality than is paid for such products in another locality, after making due allowance for the difference, if any, in the actual cost of transportation from the locality of purchase to the locality of manufacture or sale. Thus, due allowance must be made for the difference in actual cost between localities, which results in the same price being paid to all producers in the same locality. It is not a case where the purchaser must "deduct the actual costs of hauling" for one trip "when such products are gathered by wagon or truck" and where such costs must be apportioned where several purchases at various distances are made in the course of one trip. In such a situation, as has been suggested by counsel for defendant, there may be a question as to what items should be taken into consideration—whether weather, tire trouble, accidents, and other incidents peculiar to the individual trip must be considered. The statute under scrutiny applies to dealers only, those in the regular business of buying, manufacturing, and selling farm products. It must be construed in the light of business practices. Cost accounting is not unfamiliar to persons in the business. In fact, it is fair to assume that, in the various reports which they must make to the state and federal governments in connection with income taxes and other governmental requirements, the actual costs of transportation must be shown. To calculate the difference in such costs between localities does not seem to be a problem of much difficulty, especially if submitted to competent accountants. Certain well-known factors are used in truck transportation cost accounting; and, even should there be disagreement as to what factor should be included, if the same factors or elements are used in determining the actual cost between localities, there can of course be no discrimination, and the evil to be combatted is unfair discrimination. The evil which the statute attempts to reach is the discrimination between "sections, localities, communities, cities, or villages, * * * in this state."

In the Northwest Poultry case, this court stated (203 Minn. 440, 281 N. W. 754):

"The uncertainty hit at is not the difficulty of ascertaining whether close cases fall within or without the prohibition of a statute, but whether the standard established by the statute is so uncertain that it cannot be determined with reasonable definiteness that any particular act is disapproved. Nash v. United States, 229 U. S. 373, 33 S. Ct. 780, 57 L. ed. 1232; United States v. Wurzbach, 280 U. S. 396, 50 S. Ct. 167, 74 L. ed. 508."

It was also stated at p. 441 (281 N. W. 754):

"Due process requires that penal legislation expressed in general and flexible terms furnish a test based on knowable criteria which men of common intelligence who come in contact with the statute may use with reasonable safety in determining its command. Collins v. Kentucky, 234 U. S. 634, 34 S. Ct. 924, 58 L. ed. 1510."

In our opinion, the standard established by the statute in question is so certain that it can be determined with reasonable definiteness that a particular act is disapproved, and this legislation furnishes a test based on "knowable criteria" which men of common intelligence may use with reasonable safety in determining its command.

Again, in the Northwest Poultry case, the court stated at p. 441 (281 N. W. 754):

"* * * Courts are obliged to sustain legislative enactments as reasonably certain when possible, and they will resort to all acceptable rules of construction to discover a competent and efficient expression of the legislative will. Coggins v. Ely, 23 Ariz. 155, 202 P. 391; State v. Partlow, 91 N. C. 550, 49 Am. R. 652. * * *

"* * * If the guide be as definite as may be and still embrace the whole evil hit at, it is sufficient. State v. Dvoracek, 140 Iowa 266, 118 N. W. 399. Or if the statute is no more uncertain of meaning or difficult of application to necessarily varying facts than has been repeatedly sanctioned by the courts it must be given effect."

In State v. Eich, 204 Minn. 134, 136, 282 N. W. 810, 812, this court, in the language of Mr. Justice Julius J. Olson, said:

"* * * It is sufficient here to state that a statute is unconstitutional for indefiniteness if it requires or forbids in terms so vague that men of common intelligence must guess at its meaning and differ as to its application. And while a penal statute must be strictly construed, yet it is not necessary that it designate every particular circumstance that calls for imposition of the penalty. Where the act of the legislature has as its purpose to prohibit an undesirable form of conduct rather than a specific act, the definition by its very nature must be broad. Consequently if it can be determined with reasonable definiteness what is disapproved, the statute is not unconstitutional on this ground."

In Briggs v. Minnesota Delta Upsilon Club, 212 Minn. 14, 18, 2 N. W. (2d) 151, 154, the court placed upon certain language what it considered fair construction and said:

"This construction does not leave the meaning so vague as to render the statute void for uncertainty, because the kind of activity regulated is such that 'the use of general and flexible terms in fixing the standard is inescapable.'"

In Screws v. United States, 325 U. S. 91, 100, 65 S. Ct. 1031, 1035, the court stated its rule to be: "Only if no construction can save the Act from this claim of unconstitutionality [vagueness] are we willing to reach that result." It also said (325 U. S. 98, 65 S. Ct. 1033): "This Court has consistently favored that interpretation of legislation which supports its constitutionality." The same rule has been followed by this court. See, 6 Dunnell, Dig. & Supp. § 8931. The cardinal principle of statutory construction is to save, not to destroy. NLRB v. Jones & Laughlin Steel Corp. 301 U. S. 1, 30, 57 S. Ct. 615, 621, 81 L. ed. 893, 907, 108 A. L. R. 1352.

This court in Dimke v. Finke, 209 Minn. 29, 32, 295 N. W. 75, 78, stated the rule as follows:

"The rules by which this court must be guided in determining whether an act of the legislature is constitutional are well estab-

lished. Every law is presumed to be constitutional in the first in-
stance. An act will not be declared unconstitutional unless its
invalidity appears clearly or unless it is shown beyond a reasonable
doubt that it violates some constitutional provision. The power of
the court to declare a law unconstitutional is to be exercised only
when absolutely necessary in the particular case and then with
great caution. [Citing cases.]"

The phrase "actual cost of transportation," which is here attacked,
has been a part of statutes prohibiting discrimination in this state
for many years. Minn. St. 1941, § 623.08 (Mason St. 1927, § 10474),
enacted in 1907, applies to the petroleum industry. The language
there used is as follows:

"* * * after making due allowance for the difference, if any, in
* * * the actual cost of transportation from the point of produc-
tion."

In State ex rel. Young v. Standard Oil Co. 111 Minn. 85, 126 N. W.
527, this court passed upon that statute, but nothing in the opinion
suggests that defendant there challenged its validity because of
vagueness. In 35 years it has not been challenged on that ground.
The statute in the instant case was passed in 1927, and this is the
first time it has been challenged. In the Northwest Poultry case,
this court said that the identical language is in use in statutes of
like import in at least 26 other states. In that case the court also
said (203 Minn. 442, 281 N. W. 755):

"* * * Courts will also favor the conclusion that the terms of a
statute are reasonably certain if they are widely used in the same
sense in legislative enactments. Kneeland v. Emerton, 280 Mass.
371, 183 N. E. 155, 87 A. L. R. 1; Boll v. Condie-Bray G. & P. Co.
321 Mo. 92, 11 S. W. (2d) 48. The same favor will be accorded
language which has been a part of a statute for a long term of
years. Commonwealth ex rel. Woodruff v. American Baseball Club,
290 Pa. 136, 138 A. 497, 53 A. L. R. 1027; State v. Smith, 29 R. I.
245, 69 A. 1061."

As has been shown, the language of the statute here in question has been widely used in statutory enactments and has been part of a particular statute for many years.

Although under defendant's so-called assignments of error only one question is specifically presented to the court, namely, whether the terms of the statute here used to define a class of acts constituting unlawful discrimination are so vague, indefinite, and uncertain as to deny due process of law, we consider it desirable to discuss also the constitutionality of the statute in question against the challenge of lack of due process on the ground that the section omits the element of intent to destroy competition from the definition of the crime of unfair discrimination, and, further, the question of the bearing of the decision of the Supreme Court of the United States in Fairmont Creamery Co. v. Minnesota, 274 U. S. 1, 47 S. Ct. 506, 71 L. ed. 893, 52 A. L. R. 163, on our present situation.

We will first consider the Fairmont Creamery case. In that case, the statute here involved as it existed prior to amendment was passed upon. It was held unconstitutional on the ground that it infringed on the liberty of contract guaranteed by the Fourteenth Amendment. The court stated (274 U. S. 8, 11, 47 S. Ct. 507, 508, 71 L. ed. 896, 897, 898, 52 A. L. R. 167):

"Counsel for the State concede that the statute requires buyers to pay the same price for like commodities at all points of purchase, after proper allowances for transportation. Also, that it inhibits plaintiff in error from meeting local competition by increasing the price only at that place; also, from varying purchase prices to meet normal trade conditions.

\* \* \* \* \*

"It seems plain enough that the real evil supposed to threaten the cream business was payment of excessive prices by powerful buyers for the purpose of destroying competition. To prevent this the statute undertook to require every buyer to adhere to a uniform price fixed by a single transaction.

"As the inhibition of the statute applies irrespective of motive, we have an obvious attempt to destroy plaintiff in error's liberty to enter into normal contracts long regarded not only as essential to the freedom of trade and commerce but also as beneficial to the public. Buyers in competitive markets must accommodate their bids to prices offered by others, and the payment of different prices at different places is the ordinary consequent. Enforcement of the statute would amount to fixing the price at which plaintiff in error may buy, since one purchase would establish this for all points without regard to ordinary trade conditions.

"* * * We think the inhibition of the statute has no reasonable relation to the anticipated evil—high bidding by some with purpose to monopolize or destroy competition. [Citing cases.]

* * * * *

"* * * But all those cases [cited by the State] recognize the duty of the court to inquire into the real effect of any statute duly challenged because of interference with freedom of contract guaranteed by the Fourteenth Amendment, and to declare it invalid when without substantial relation to some evil within the power of the State to suppress and a clear infringement of private rights."

The opinion was written by Mr. Justice McReynolds. Mr. Justices Holmes, Brandeis, and Stone dissented.

In Nebbia v. New York, 291 U. S. 502, 54 S. Ct. 505, 78 L. ed. 940, 89 A. L. R. 1469, the question raised was whether the federal constitution prohibits a state from fixing the selling price of milk. The purpose of the statute was to prevent price cutting. In holding the statute constitutional, the court said (291 U. S. 537, 539, 54 S. Ct. 516, 517, 78 L. ed. 957, 958):

"So far as the requirement of due process is concerned, and in the absence of other constitutional restriction, a state is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, and to enforce that policy by legislation adapted to its purpose. The courts are without authority either to declare such policy, or, when it is declared by the legislature, to override it.

If the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied, and judicial determination to that effect renders a court *functus officio*. 'Whether the free operation of the normal laws of competition is a wise and wholesome rule for trade and commerce is an economic question which this court need not consider or determine.' Northern Securities Co. v. United States, 193 U. S. 197, 337-8, 24 S. Ct. 436, 457, 48 L. ed. 679. And it is equally clear that if the legislative policy be to curb unrestrained and harmful competition by measures which are not arbitrary or discriminatory it does not lie with the courts to determine that the rule is unwise. With the wisdom of the policy adopted, with the adequacy or practicability of the law enacted to forward it, the courts are both incompetent and unauthorized to deal. The course of decision in this court exhibits a firm adherence to these principles. Times without number we have said that the legislature is primarily the judge of the necessity of such an enactment, that every possible presumption is in favor of its validity, and that though the court may hold views inconsistent with the wisdom of the law, it may not be annulled unless palpably in excess of legislative power.

\* \* \* \* \*

"\* \* \* Price control, like any other form of regulation, is unconstitutional only if arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt, and hence an unnecessary and unwarranted interference with individual liberty."

Mr. Justice McReynolds wrote a dissenting opinion in which he cited the Fairmont Creamery case in support of his position. Although the court in so many words did not overrule the Fairmont Creamery case, the effect of the decision does overrule it.

See, also, West Coast Hotel Co. v. Parrish, 300 U. S. 379, 57 S. Ct. 578, 81 L. ed. 703, 108 A. L. R. 1330; Highland Farms Dairy, Inc. v. Agnew, 300 U. S. 608, 57 S. Ct. 549, 81 L. ed. 835; Townsend v.

Yeomans, 301 U. S. 441, 57 S. Ct. 842, 81 L. ed. 1210; United States v. Rock Royal Co-operative, Inc. 307 U. S. 533, 59 S. Ct. 993, 83 L. ed. 1446; United States v. Darby, 312 U. S. 100, 61 S. Ct. 451, 85 L. ed. 609, 132 A. L. R. 1430.

In Olsen v. Nebraska ex rel. Western Reference & Bond Assn. Inc. 313 U. S. 236, 243, 244, 61 S. Ct. 862, 865, 85 L. ed. 1305, 1308, 133 A. L. R. 1500, where the court held that price-fixing legislation is not dependent on whether the business in question was "affected with a public interest," it said:

"* * * Save for that decision [Williams v. Standard Oil Co. 278 U. S. 235, 49 S. Ct. 115, 73 L. ed. 287, 60 A. L. R. 596] and Morehead v. New York ex rel. Tipaldo, 298 U. S. 587, 56 S. Ct. 918, 80 L. ed. 1347, 130 A. L. R. 1445, holding unconstitutional a New York statute authorizing the fixing of women's wages, the subsequent cases in this Court have given increasingly wider scope to the price-fixing powers of the states and of Congress."

. In addition, L. 1927, c. 252 (Minn. St. 1941, § 17.15 [Mason St. 1940 Supp. § 6248-3]), amended the statute which the court in the Fairmont Creamery case held invalid. The amendment is as follows (§ 3):

"* * * It shall not be unfair discrimination for any person to pay, in any section, locality, community, city, or village, a price equal to that actually paid on the same day by any bona fide competitor in such place for farm products of the same kind and grade, provided such price is paid in good faith effort to meet such competition, and the burden of proving such facts shall be upon the defendant."

This amendment seems to meet the objection of the court in the Fairmont Creamery case, 274 U. S. 8, 47 S. Ct. 508, 71 L. ed. 897, 52 A. L. R. 167, *supra,* upon which, apparently, the decision was based, when it said:

"* * * Buyers in competitive markets must accommodate their bids to prices offered by others; and the payment of different prices

at different places is the ordinary consequent. Enforcement of the statute would amount to fixing the price at which plaintiff in error may buy, since one purchase would establish this for all points without regard to ordinary trade conditions."

The statute in question omits the element of intent to destroy competition from the definition of unfair competition. So did the statute passed upon in the Fairmont Creamery case. The United States court commented on the fact that (274 U. S. 8, 47 S. Ct. 508, 71 L. ed. 897, 52 A. L. R. 167) "the inhibition of the statute applies irrespective of motive," but it did not hold the statute unconstitutional on the ground that it violated the due process provision of the constitution in that it omits the element of intent to destroy competition from the definition of the offense of unfair discrimination. In United States v. Balint, 258 U. S. 250, 42 S. Ct. 301, 66 L. ed. 604, the court held that whether *scienter* is a necessary element in a statutory crime, though not expressed in the statute, is a question of legislative intent to be answered by a construction of the statute. It further held that punishment for an illegal act done by one ignorant of the facts making it illegal is not contrary to due process of law. The court said (258 U. S. 252, 42 S. Ct. 302, 66 L. ed. 605):

"* * * It has been objected that punishment of a person for an act in violation of law when ignorant of the facts making it so, is an absence of due process of law. But that objection is considered and overruled in Shevlin-Carpenter Co. v. Minnesota, 218 U. S. 57, 69, 70, 30 S. Ct. 663, 666, 54 L. ed. 930, in which it was held that in the prohibition or punishment of particular acts, the State may in the maintenance of a public policy provide 'that he who shall do them shall do them at his peril and will not be heard to plead in defense good faith or ignorance.' Many instances of this are to be found in regulatory measures in the exercise of what is called the police power where the emphasis of the statute is evidently upon achievement of some social betterment rather than the punishment of the crimes as in cases of *mala in se*. [Citing cases.]"

In Armour Packing Co. v. United States, 209 U. S. 56, 85, 28 S. Ct. 428, 437, 52 L. ed. 681, 696, the court said:

"* * * While intent is in a certain sense essential to the commission of a crime, and in some classes of cases it is necessary to show moral turpitude in order to make out a crime, there is a class of cases within which we think the one under consideration falls, where purposely doing a thing prohibited by statute may amount to an offense, although the act does not involve turpitude or moral wrong. In this case the statutes provide it shall be penal to receive transportation of goods at less than the published rate."

In United States v. Dotterweich, 320 U. S. 277, 280, 64 S. Ct. 134, 136, 88 L. ed. 48, 51, the court said:

"* * * The prosecution to which Dotterweich was subjected is based on a now familiar type of legislation whereby penalties serve as effective means of regulation. Such legislation dispenses with the conventional requirement for criminal conduct—awareness of some wrongdoing. In the interest of the larger good it puts the burden of acting at hazard upon a person otherwise innocent but standing in responsible relation to a public danger."

In 2 Dunnell, Dig. & Supp. § 2409, it is stated:

"It is sometimes said that a criminal intent is an essential element of all crimes. * * * It is certainly not true that there must always be a culpable intent. * * * The legislature may forbid the doing of an act and make its commission criminal without regard to the intention, knowledge, or motive of the doer," and notes.

And in 2 Dunnell, Dig. & Supp. § 2407, the author makes this statement:

"It is the exclusive province of the legislature to declare what acts, deemed inimical to the public welfare shall constitute a crime, to prohibit the same, and impose appropriate punishment for a violation thereof. Judicial consideration of such enactments is limited to the inquiry whether the constitutional rights of the citizens are

thereby violated or impaired." See, State v. Bean, 199 Minn. 16, 270 N. W. 918; State v. Sobelman, 199 Minn. 232, 271 N. W. 484.

In State v. Quackenbush, 98 Minn. 515, 521, 108 N. W. 953, 956, the court said:

"Certain acts, in themselves innocent and indifferent, are made criminal when done under circumstances which experience has taught will probably result in some harm which the law seeks to prevent."

In 14 Am. Jur., Criminal Law, § 16, the following language is used:

"* * * Undoubtedly, it is within the power of the legislature to declare an act criminal irrespective of the intent or knowledge of the doer of the act. In accordance with this power, the legislature in many instances has prohibited, under penalty, the performance of specific acts. The doing of the inhibited act constitutes the crime, and the moral turpitude or purity of the motive by which it was prompted and the knowledge or ignorance of its criminal character are immaterial circumstances on the question of guilt. The only fact to be determined in these cases is whether the defendant did the act."

In State v. Dombroski, 145 Minn. 278, 279, 176 N. W. 985, this court stated:

"At common law knowledge of the criminality of an act and evil intent in committing it were essential elements of all crimes, and without a showing thereof directly or by facts creating a necessary inference of their existence no conviction could be had. Clark and Marshall, Crimes, § 55. But the rule of the common law on the subject is not in force in this state, for, as in other jurisdictions, we recognize the power and authority of the legislature in declaring what act or acts shall constitute a crime, to make those elements essential to a particular crime, or dispense therewith as may be deemed expedient and best suited to the prevention of crime and

disorder. And a statute by which such elements are so dispensed with must be given force and effect by the courts. [Citing cases.]"

In our opinion, the statute is not so vague, indefinite, and uncertain as to be held invalid on the ground that it denies due process of law.

Neither is it unconstitutional against the challenge of lack of due process on the ground that the section omits the element of intent to destroy competition from the definition of the crime of unfair discrimination. It is also our opinion that Fairmont Creamery Co. v. Minnesota, 274 U. S. 1, 47 S. Ct. 506, 71 L. ed. 893, 52 A. L. R. 163, *supra*, no longer states the law, in view of later decisions by the Supreme Court of the United States.

The questions submitted to us are answered in the negative and the case remanded.

So ordered.

LORING, CHIEF JUSTICE (dissenting).

Legislation against unfair competition in the purchase of butterfat by manufacturers or vendors seems to have got under way in L. 1909, c. 468; L. 1913, c. 230; L. 1917, c. 337; and L. 1921, c. 305, in all of which the intent to injure or destroy competition was included in the definition of the offense created. In L. 1923, c. 120, for the first time the sinister purpose was eliminated from the definition of the offense. The prosecution of the Fairmont Creamery Company followed, and the act was ultimately declared unconstitutional as lacking due process by the United States Supreme Court in Fairmont Creamery Co. v. Minnesota, 274 U. S. 1, 9, 47 S. Ct. 506, 508, 71 L. ed. 893, 897, 52 A. L. R. 163, for the reason that, without the element of sinister intent in the definition of the offense, the statute had "no reasonable relation to the anticipated evil."

While the Fairmont Creamery case was under consideration by the United States Supreme Court, and doubtless because of some remark from the bench on the argument, L. 1927, c. 252, covering other farm products, eggs, and poultry, as well as butterfat, was enacted, obviously with the thought that permitting a purchaser to

meet, but not overbid, prices offered by competitors would obviate the constitutional objections upon which the Fairmont Creamery case was expected to turn.

In L. 1937, c. 420, the 1927 law was reënacted with some additional provisions not here relevant. The 1937 law was held unconstitutional in State v. Northwest Poultry & Egg Co. 203 Minn. 438, 281 N. W. 753, because its definition of the offense was so vague and uncertain as to lack due process. That decision has stood until now. L. 1945, c. 122, enacted since the acts complained of in the case at bar, has changed from "actual" to "reasonable" the definition of costs required to be deducted. Obviously, this was done in an endeavor to eliminate the infirmities which resulted in the Northwest Poultry decision. No question is here raised as to the effect on this case of the change in definition.

The state relies heavily upon the opinions of this court in State v. Fairmont Creamery Co. 162 Minn. 146, 202 N. W. 714, 42 A. L. R. 548, and in *Id.* 168 Minn. 378, 210 N. W. 163, 608, subsequently reversed by the Supreme Court of the United States in 274 U. S. 1, 47 S. Ct. 506, 71 L. ed. 893, 52 A. L. R. 163, and upon the dissenting opinions in State v. Northwest Poultry & Egg Co. 203 Minn. 438, 281 N. W. 753. It also insists that the Fairmont Creamery case has been overruled by the Nebbia case and subsequent ones.

Defendant has made what it calls "Assignments of Error," which, of course, is not only unnecessary in a criminal case but does not serve to circumscribe the questions presented to this court if they are raised and argued by defendant. Such assignment is particularly out of place where the trial court made no ruling but has, as in this case, certified questions to this court.

I agree with Mr. Justice Thomas Gallagher that we should adhere to the holding in State v. Northwest Poultry & Egg Co. 203 Minn. 438, 281 N. W. 753, since the question of vagueness was there thoroughly threshed out and the majority of this court held that the act now under consideration was unconstitutional as lacking due process. We should not subject this court to the criticism that we are vacillating with every change of personnel

and that lawyers will not know how to advise their clients or trial courts know what principles to rely on.

In my view, there are more compelling reasons than those stated in the Northwest Poultry case why we should hold that the statute under consideration should be held to lack due process. In that connection, it is important for us to bear in mind that we have a duty to perform in interpreting our own constitution and the due process clause contained therein. When we apply our state due process clause, we are not bound to follow any interpretive relaxation of the inhibitions of the Fourteenth Amendment made by the Supreme Court of the United States. We are bound by the decisions of that court as to what the due process clause of the Fourteenth Amendment prohibits; but, in interpreting our own clause, we are not bound to follow what that court says is not a violation of the Fourteenth Amendment. We should exercise our own judicial judgment as to what we deem a violation of our own constitution. Reed v. Bjornson, 191 Minn. 254, 261, 253 N. W. 102, 105; Highland Farms Dairy, Inc. v. Agnew, 300 U. S. 608, 613, 57 S. Ct. 549, 552, 81 L. ed. 835, 840.

In McElhone v. Geror, 207 Minn. 580, 585, 292 N. W. 414, 417, this court had before it the so-called fair trade practices act, which prohibited the sale of merchandise below its cost "for the purpose or with the effect of injuring competitors and destroying competition." It seems clear from the expressions in that opinion that it was the view of this court that it was not due process to' inhibit business practices that are not ordinarily harmful unless they are indulged in for the purpose of injuring competitors or destroying competition. In that case, the law was sustained because such purpose and effect were included in the definition of the offense created. Other courts of high standing have taken that view. Commonwealth v. Zasloff, 338 Pa. 457, 13 A. (2d) 67, 128 A. L. R. 1120, is a strong case on this point. There, as in McElhone v. Geror, the act under consideration was an inhibition against price cutting; but, unlike L. 1939, c. 403, the Pennsylvania act, like the act here under consideration, applied regardless of intent or

of its effect upon competitors. It was held unconstitutional. See, also, for a like holding, State v. Packard-Bamberger & Co. Inc. 123 N. J. L. 180, 8 A. (2d) 291. It seems to me that it is not without significance that the legislature adopted the theory in L. 1939, c. 403, that sinister intent and harmful effect were essential elements in legislation against unfair and competitive trade practices. If we hold that such elements are not necessary when ordinarily the practice inhibited is not harmful, we shall stand alone.

The majority opinion here takes the position that Fairmont Creamery Co. v. Minnesota, 274 U. S. 1, 47 S. Ct. 506, 71 L. ed. 893, 52 A. L. R. 163, is no longer the law, and that particularly Nebbia v. New York, 291 U. S. 502, 54 S. Ct. 505, 78 L. ed. 940, 89 A. L. R. 1469, has in effect overruled it. I do not so analyze the two cases. Both the Fairmont Creamery and the Nebbia cases are governed by the same principle—that the inhibition *of the statute must have reasonable relation to the apprehended evil. Whether it has such relation is determined by whether the prohibited practice produces evil consequences in ordinary circumstances where business is carried on as usual.* In both opinions the language used should be interpreted in the light of the question presented and the facts to which the law was applied. General statements culled from opinions without reference to the facts under consideration are of little or no value as authority and may be positively misleading when applied to problems wholly different in character. We have a concrete problem to solve, and it is my opinion that it can be solved by well-established principles.

In the Fairmont Creamery case, it was held that the evil sought to be remedied was high bidding, with the purpose to destroy competition, and that the principle was violated by prohibiting the exercise of private rights the exercise of which "does not ordinarily produce evil consequences, but the reverse." The court stated (274 U. S. 9, 47 S. Ct. 508, 71 L. ed. 897, 52 A. L. R. 167):

"The real question comes to this—May the State, in order to prevent some strong buyers of cream from doing things which may

tend to monopoly, inhibit plaintiff in error from carrying on its business *in the usual way heretofore regarded as both moral and beneficial to the public and not shown now to be accompanied by evil results as ordinary incidents?* Former decisions here require a negative answer. We think the inhibition of the statute has *no reasonable relation to the anticipated evil*—high bidding by some with purpose to monopolize or destroy competition. Looking through form to substance, it clearly and unmistakably infringes private rights whose exercise does not ordinarily produce evil consequences, but the reverse." (Italics supplied.)

And in commenting upon the absence of intent from the definition of the crime, the court quoted with approval from Tyson and Brother v. Banton, 273 U. S. 418, 443, 47 S. Ct. 426, 432, 71 L. ed. 718, 728:

"* * * One vice of the contention is that the statute itself ignores the righteous distinction between guilt and innocence, since it applies wholly irrespective of the existence of fraud, collusion or extortion * * * and fixes the resale price as well where the evils are absent as where they are present. *It is not permissible to enact a law which, in effect, spreads an all-inclusive net for the feet of everybody upon the chance that, while the innocent will surely be entangled in its meshes, some wrong-doers also may be caught."* (Italics supplied.)

(This court in McElhone v. Geror, 207 Minn. 580, 585, 292 N. W. 414, 417, quoted the italicized language as applied to persons "carrying on business in a legitimate way.")

In the Nebbia case, 291 U. S. 502, 54 S. Ct. 505, 78 L. ed. 940, 89 A. L. R. 1469, the evil feared was that unrestrained competition would prevent producers from receiving a reasonable return for their labor and investment, which would threaten the relaxation of vigilance against contamination and would threaten the destruction of an industry vital to the health and prosperity of the state. It was held that the means employed (fixing adequate prices) had a (291 U. S. 525, 54 S. Ct. 511, 78 L. ed. 950) *"real and sub-*

*stantial relation to the object sought to be attained"*; so there is no conflict so far as the principle here involved is concerned between the Nebbia and the Fairmont Creamery cases. They both apply the same principle but reach different results, due to the fact that in one case the definition of the crime had no reasonable relation to the evil sought to be eliminated; whereas, in the other case, the definition did have such reasonable relation. In the Nebbia case, it could hardly be held otherwise than that the maintenance of the fixed prices was necessary to restrain the ruthless competition then going on in the milk business. In that case, the usual course of business under the conditions there involved produced the evil consequences sought to be cured. There was too much competition for the good of the industry and the health of the people of New York.

In the Fairmont Creamery case, it stands adjudicated by the Supreme Court of the United States that (274 U. S. 9, 47 S. Ct. 508, 71 L. ed. 897, 52 A. L. R. 167) :

"* * * *the inhibition of the statute has no reasonable relation to the anticipated evil*—high bidding by some with purpose to monopolize or destroy competition. Looking through form to substance, it *clearly and unmistakably infringes private rights whose exercise does not ordinarily produce evil consequences, but the reverse.*" (Italics supplied.)

Thus, it is obvious that much more was decided than that the statute was faulty because it omitted permission to meet competitive prices. The case really turned on the application of the principle discussed above.

Perhaps the most persuasive answer to the contention that the Nebbia case in effect overruled the Fairmont Creamery case is contained in the opinion of the three-judge federal court of the Minnesota district in the case of the Great Atlantic & Pacific Tea Co. v. Ervin (D. C.) 23 F. Supp. 70, wherein Circuit Judge Sanborn and District Judges Nordbye and Joyce rendered an extraordinarily able and thorough opinion in which many of the questions involved

in the various provisions of the statute known as the Minnesota Fair Trade Practices Act, L. 1937, c. 116, were involved. While much of the discrimination there inhibited was that perpetrated (23 F. Supp. 72) "intentionally, for the purpose of destroying the competition of any regular established dealer in such commodity, * * * or to prevent the competition of any person," there were some features of the inhibition that applied regardless of intent. That court, having before it both the Nebbia and the Fairmont Creamery cases, did not regard the Nebbia case as overruling the Fairmont Creamery case. It defined the principle involved in these cases as follows (23 F. Supp. 76):

*"The guaranty of due process demands only that the means shall not be unreasonable, arbitrary, or capricious, and that they shall have a real and substantial relation to the object sought to be attained,"* citing the Nebbia case.

In discussing Central Lbr. Co. v. South Dakota, 226 U. S. 157, 33 S. Ct. 66, 57 L. ed. 164, which involved a statute which included sinister intent in its inhibitions and which in the Ervin case was cited by the defendants as justifying their position, the court distinguished the South Dakota case from the paragraph of the Minnesota statute which did not involve intent, and cited the Fairmont Creamery case as determinative of the question of the validity of the paragraph of the Minnesota law which they were then considering (23 F. Supp. 78). "There [in the Fairmont Creamery case], as here, the statute applied regardless of intent or purpose," and the court quoted with approval the part of the Fairmont Creamery decision which I have quoted above, *including the test as to the exercise of rights which do not ordinarily produce evil consequences.*

In short, the court holds that the restatement in the Nebbia case of the rule as to what business is subject to legislative regulation does not leave the legislature free of all restraints in regulating business. It must still respect the due process clause, which demands that inhibitions must have a *reasonable relation to the object sought to be attained* and that *whether it does have that rela-*

*tion depends on whether, under ordinary circumstances, where there is no sinister intent, the inhibited practice has no harmful consequences.*

Even as amended, the statute before us allows a dealer to meet, but not to overbid, his competitor. Overbidding, if innocent of sinister intent or harmful effect, is certainly *incident to normal practice in a competitive market.* It benefits rather than harms the producer unless indulged in in furtherance of a purpose and with the effect of eliminating competition.

Olsen v. Nebraska ex rel. Western Reference & Bond Assn. Inc. 313 U. S. 236, 61 S. Ct. 862, 85 L. ed. 1305, 133 A. L. R. 1500, relied on by the state, merely involved a limitation on commissions which employment brokers might charge persons for whom they found employment.

To summarize, it strikes me, first, that we should follow our own decision in the Northwest Poultry case that the statute here under consideration lacks clear definition of the crime sought to be created, and, second, that the United States Supreme Court has not overruled, by implication or otherwise, the principle recognized in the Fairmont Creamery case; that, even if it had, such interpretive relaxation of the rule of due process under the Fourteenth Amendment is not controlling in our interpretation of our own due process clause; that, since paying different prices in different sections of the state is not unusual or harmful in the ordinary course of competitive business and is compulsory under the present statute on account of the variance in required deductions where there is no competitor, the forbidding of such practice, unless related to an intent to destroy or injure competition, lacks due process under our own constitution.

I submit that the majority opinion leaves the bench and bar as well as dealers in farm products without intelligible guidance in determining proper conduct, unless, indeed, it is the court's purpose to establish the rule that the legislature is free of all restraints in regulating business. That, in effect, is the state's contention here.

THOMAS GALLAGHER, JUSTICE (dissenting).

I am of the opinion that the decision of this court in State v. Northwest Poultry & Egg Co. 203 Minn. 438, 281 N. W. 753, answers the question here to be determined directly in favor of defendant, and that the language of the statute, to wit, "after making due allowance for the difference, if any, in the actual cost of transportation from the locality of purchase to the locality of manufacture or sale," is invalid for the same reason that this court, in that case, held invalid the clause "or who shall fail to deduct the actual costs of hauling when such products are gathered by wagon or truck." In discussing the latter clause, which became part of the act by virtue of L. 1937, c. 420, this court stated (203 Minn. 443, 444, 281 N. W. 755, 756):

" 'Actual cost' has no common-law significance, and it is without any well understood trade or technical meaning. * * * Whether actual cost in this case is limited to gasolene or whether it extends to depreciation, license fees, insurance, repairs, the wages of the driver, or the actual worth of the services of an operator if driven by the owner is not stated. The statute neither provides which items comprise the actual cost of transportation nor how they are to be computed as to one trip, nor yet how the total is to be apportioned if several purchases are collected from a number of producers located varying distances from the point of manufacture or sale in the course of one trip. * * * we are compelled to hold that the terms used to define this class of acts constituting unlawful discrimination are so vague, indefinite, and uncertain as to deny due process of law."

It is to be noted that the statute applies irrespective of motive and without reference to fraud, intent to create a monopoly, or intent to destroy competition. Nor does the statute limit its application to purchases which have the *effect* of limiting or eliminating competition. The *information* contained no assertion that defendant was acting in restraint of trade or endeavoring to limit competition. Nor is good faith a defense under the statute.

Defendant buys poultry at many places in southern Minnesota and northern Iowa for processing at its Wells, Minnesota, plant. There is no way in which defendant can ascertain with reasonable certainty whether the prices at which it buys in various localities are in violation of the statute. If defendant pays a certain price for poultry at Wells on a given day and the same price for like poultry at each of its other Minnesota buying points, it clearly violates the statute, as the actual cost of transporting the poultry to Wells from the various other points at which it is purchased cannot be the same.

The statute uses the term "actual cost," which means the *exact* cost and not the *average* cost, nor a *reasonable proportion* of the cost, nor a *reasonable advance estimate* of the cost. Actual cost changes from day to day. It cannot be accurately known before the poultry is purchased. It can be computed only after the transportation has been completed. Thus, on a certain outbound trip, defendant may carry a substantial tonnage of poultry food (in which it also deals), for delivery along the route, while on a subsequent trip it may have no call for such merchandise. Obviously, its cost will vary on the two trips. Again, on one trip, trucks may meet with mechanical difficulties or experience tire trouble, which unquestionably will affect the cost of transportation to the locality involved. Factors such as these and numerous others constantly affect and vary the actual cost of transportation.

The statute gives no suggestion as to which factors shall be included in calculating actual cost, or whether such cost shall include requirements for liability insurance, depreciation, service calls, overtime wages for drivers, and many other factors which may or may not have been contemplated by the legislature. The statute provides no formula or suggestion as to how actual cost shall be computed.

It has been suggested that the term "actual cost" has been used in other statutes and therefore should be upheld here. It is true that the term has been used in statutes prohibiting discrimination in other industries. See, Minn. St. 1941, § 623.08 (Mason St. 1927,

§ 10474), originally enacted in 1907. Obviously, the term there, however, relates to cost of transportation by rail. Railroad transportation is not involved here, and the term "actual cost of transportation" when applied thereto does not involve the uncertainty and difficulties apparent here. A common carrier by rail is required to have a known schedule of rates as to different types of merchandise and as to different points of transportation, and actual cost of rail transportation is thus readily capable of ascertainment.

Here, while at the end of the year it may be possible for expert accountants to ascertain the dealer's actual cost as between various localities, under the statute in question it is obvious that such cost cannot be ascertained in advance, and that it must vary from year to year, depending upon the conditions met with, including such factors as weather, supply and demand, mechanical difficulties, and numerous other factors which go into a dealer's transportation costs.

As stated in Anderson v. Burnquist, 216 Minn. 49, 53, 11 N. W. (2d) 776, 778:

"* * * The law does not permit speculation or conjecture in construing an act. It is not the function of the judicial branch of the government to remedy or supply defects in matters committed to the legislature."

The United States Supreme Court in Screws v. United States, 325 U. S. 91, 103, 65 S. Ct. 1031, 1036, has expressed this principle as follows:

"* * * The constitutional requirement that a criminal statute be definite serves a high function. It gives a person acting with reference to the statute fair warning that his conduct is within its prohibition. This requirement is met when a statute prohibits only 'willful' acts in the sense we have explained. One who does act with such specific intent is aware that what he does is precisely that which the statute forbids. He is under no necessity of guessing whether the statute applies to him * * * for he either

knows or acts in reckless disregard of its prohibition of the deprivation of a defined constitutional or other federal right."

In accordance with these authorities, it is my opinion that the term "actual cost of transportation" as used in the statute is so vague, indefinite, and uncertain that men of common intelligence must *guess* at its meaning and may differ as to its application, and, accordingly, that the statute should be held invalid under the due process clauses of the state and federal constitutions.

