ASSOCIATED MERCHANTS OF MONTANA ET AL., RESPONDENTS, *v.* ORMESHER ET AL., APPELLANTS.

(No. 7,885.)

(Submitted January 16, 1939. Decided February 4, 1939.)

[86 Pac. (2d) 1031.]

*Mr. Fred W. Schilling, Mr. E. C. Kurtz* and *Mr. Jay M. Kurtz,* for Appellants, submitted an original and a reply brief; *Mr. Schilling* and *Mr. E. C. Kurtz* argued the cause orally.

*Messrs. Pope, Smith & Smith,* for Respondents, submitted a brief; *Mr. Walter L. Pope* and *Mr. Allen K. Smith* argued the cause orally.

536

*Mr. John W. Bonner,* Counsel for Montana Trade Commission, appearing as *Amicus Curiae,* submitted a brief.

540

MR. JUSTICE ANGSTMAN delivered the opinion of the court.

This action was brought to enjoin the defendants from violating the provisions of Chapter 80, Laws of 1937, in their business of merchandising as grocers. To the complaint charging its violation, defendants first filed a demurrer. The demurrer being overruled, they filed an answer putting in issue the allegations of the complaint, and asserting by affirmative defenses that Chapter 80, and particularly section 3 thereof, is unconstitutional as in violation of certain specified sections of the state and federal Constitutions. The reply denied the affirmative allegations of the answer.

The cause was tried to the court sitting without a jury. The court made findings of fact and conclusions of law favorable to plaintiffs, finding that defendants had violated sections 3 and 4 of the Act, and entered a decree restraining and enjoining defendants from "selling, offering for sale, or advertising for sale any such articles or products (covered by the findings) at less than the cost thereof to such defendants, unless within the exceptions allowed by law, and from further like violations of the provisions of sections 3 and 4 of Chapter 80 of the Session Laws of 1937." The appeal is from the judgment.

The record on appeal consists of the judgment roll only, without the evidence introduced at the trial; hence the only question for us to determine is whether Chapter 80 is valid. This we must determine from the Act itself without the aid of factual background save as appears from the findings of fact.

Section 3 of the Act provides:

"It shall be unlawful for any person, partnership, firm, corporation, joint stock company, or other association engaged in business within this state, to sell, offer for sale or advertise for sale any article or product, or service or output of a service trade, at less than the cost thereof to such vendor, or give, offer to give or advertise the intent to give away any article or product, or service or output of a service trade for the purpose of injuring competitors and destroying competition, and he or it shall also be guilty of a misdemeanor, and on conviction thereof shall be subject to the penalties set out in Section 11 of this Act for any such act.

"The term 'cost' as applied to production is hereby defined as including the cost of raw materials, labor and all overhead expenses of the producer; and as applied to distribution 'cost' shall mean the invoice or replacement cost, whichever is lower, of the article or product to the distributor and vendor plus the cost of doing business by said distributor and vendor.

"The 'cost of doing business' or 'overhead expense' is defined as all costs of doing business incurred in the conduct of such business and must include, without limitation the following items of expense: labor (including salaries of executives and officers), rent, interest on borrowed capital, depreciation, selling cost, maintenance of equipment, delivery costs, credit losses, all types of licenses, taxes, insurance and advertising."

Section 4 provides: "In establishing the cost of a given article or product to the distributor and vendor, the invoice cost of said article or product purchased at a forced, bankrupt, closeout sale, or other sale outside of the ordinary channels of trade may not be used as a basis for justifying a price lower than one based upon the replacement cost as of date of said sale of said article or product replaced through the ordinary channels of

trade, unless said article or product is kept separate from goods purchased in the ordinary channels of trade and unless said article or product is advertised and sold as merchandise purchased at a forced, bankrupt, closeout sale, or by means other than through the ordinary channels of trade, and said advertising shall state the conditions under which said goods were so purchased, and the quantity of such merchandise to be sold or offered for sale.''

Other provisions of the Act need not be referred to specifically except to say that in addition to declaring that violation of the prohibited acts shall constitute a misdemeanor, the Act authorizes injunction proceedings to enjoin a continuance of the prohibited acts. Also section 6 provides that the provisions of sections 3, 4 and 5 have no application to sales made ''(a) In closing out in good faith, the owner's stock or any part thereof, for the purpose of discontinuing his trade in any such stock or commodity, and in the case of the sale of seasonal goods or to the bona fide sale of perishable goods to prevent loss to the vendor by spoilage or depreciation, provided notice is given to the public thereof; (b) When the goods are damaged or deteriorated in quality, and notice is given to the public thereof; (c) By an officer acting under the orders of any court; (d) In an endeavor made in good faith to meet the legal prices of a competitor as herein defined selling the same article or product, or service or output of a service trade, in the same locality or trade area.''

The Act is assailed as being contrary to section 1 of the Fourteenth and to the Fifth Amendment to the United States Constitution, U. S. C. A., and to sections 3 and 27 of Article III of the Montana Constitution, as a deprivation of liberty and property without due process of law.

Defendants contend that Chapter 80 is a price-fixing statute, and, therefore, invalid under the holding of this court in *H. Earl Clack Co.* v. *Public Service Com.*, 94 Mont. 488, 22 Pac. (2d) 1056, and contrary to the decisions of the United States Supreme Court cited and relied on in the *H. Earl Clack Co. Case.* The statute here considered is not a price-fixing

statute. Its aim and object is to prevent unfair competition in business. As a means to that end the Act prohibits sales of commodities below cost when done "for the purpose of injuring competitors and destroying competition." It fixes a minimum price only, leaving in the seller the discretion to sell at whatever price above that he chooses. The minimum price is fixed not as an end in itself, but to prevent ruinous price cutting injuring or destroying competitors.

This contention, under an identical statute, was before the supreme court of California in *Wholesale Tobacco Dealers Bureau* v. *National Candy & T. Co.,* 11 Cal. (2d) 634, 82 Pac. (2d) 3, 118 A. L. R. 486, where the court in speaking on this point said: "In its true sense it is not a price fixing statute at all. It merely fixes a level below which the producer or distributor may not sell with an intent to injure a competitor. In all other respects price is the result of untrammelled discretion."

Speaking of a very similar statute, the supreme court of Tennessee, in *Rust* v. *Griggs,* 172 Tenn. 565, 113 S. W. (2d) 733, said: "In consideration of this statute we may first observe that it is not a price-fixing law. It is not therefore necessary to consider decisions of this court and the Supreme Court of the United States respecting statutes of that sort. As appears from section 2 of the statute, its object is to prevent deception of the public and to prevent practices which tend to injure competitors unfairly and thereby lessen competition or unreasonably restrain trade or create a monopoly. * * * Sales at less than cost therefore are not denounced by the Act of 1937 unless such sales are made with the intent or effect to deceive the public, to injure creditors, or to destroy competition."

Under an identical statute the supreme court of Wyoming, in *State* v. *Langley,* (Wyo.) 84 Pac. (2d) 767, in answering the same contention here made and after referring to the *Clack Case,* supra, and decisions of the United States Supreme Court cited therein, said: "In these cases the legislature sought to fix, absolutely, the price of a commodity or labor. It was held that the subject sought to be regulated was not affected with a public interest and that the attempted regulation was unreasonable.

These cases, of course, are clearly distinguishable from the case at bar. The legislature, by the statute here in question, sought, not to fix prices, but to prevent ruinous price cutting, by which competitors might be injured and competition be destroyed. To do that, it was, of course, necessary to fix some limit. It might, perhaps, have set other limits than that which was fixed. The limit of 'not below cost' was only one of a number of others which might, perhaps, have been selected. The one actually selected was thought to be the most just under the circumstances. It was but the means to an end, not an end in itself. As was said in *Stephenson* v. *Binford,* 287 U. S. 251, 53 Sup. Ct. 181, 77 L. Ed. 288, 87 A. L. R. 721, speaking of the power of a commission to fix the minimum rate for private carriers: 'The authority is limited to the fixing of minimum rates. The contract carrier may not charge less than the rates so fixed, but is left free to charge as much more as he sees fit and can obtain. Undoubtedly, this interferes with the freedom of the parties to contract, but it is not such an interference as the Fourteenth Amendment forbids.' (See, also, *State* v. *Drayton,* infra [82 Neb. 254, 117 N. W. 768, 23 L. R. A. (n. s.) 1287, 130 Am. St. Rep. 671.)'' See to the same general effect, *Public Service Com.* v. *Great Northern Utilities Co.,* 289 U. S. 130, 53 Sup. Ct. 546, 77 L. Ed. 1080, and *Old Dearborn D. Co.* v. *Seagram-Distillers Corp.,* 299 U. S. 183, 57 Sup. Ct. 139, 81 L. Ed. 109, 106 A. L. R. 1476.

The Supreme Court of the United States, in *Nebbia* v. *New York,* 291 U. S. 502, 54 Sup. Ct. 505, 78 L. Ed. 940, 89 A. L. R. 1469, had this to say:

''But there can be no doubt that upon proper occasion and by appropriate measures the state may regulate a business in any of its aspects, including the prices to be charged for the products or commodities it sells. So far as the requirement of due process is concerned, and in the absence of other constitutional restriction, a state is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, and to enforce that policy by legislation adapted to its purpose. The courts are without authority either to declare such policy,

or, when it is declared by the legislature, to override it. If the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied, and judicial determination to that effect renders a court *functus officio*. 'Whether the free operation of the normal laws of competition is. a wise and wholesome rule for trade and commerce is an economic question which this court need not consider or determine.' (*Northern Securities Co.* v. *United States*, 193 U. S. 197, 337, 338, 24 Sup. Ct. 436, 457, 48 L. Ed. 679.) And it is equally clear that if the legislative policy be to curb unrestrained and harmful competition by measures which are not arbitrary or discriminatory it does not lie with the courts to determine that the rule is unwise. With the wisdom of the policy adopted, with the adequacy or practicability of the law enacted to forward it, the courts are both incompetent and unauthorized to deal. The course of decision in this court exhibits a firm adherence to these principles. Times without number we have said that the Legislature is primarily the judge of the necessity of such an enactment, that every possible presumption is in favor of its validity, and that though the court may hold views inconsistent with the wisdom of the law, it may not be annulled unless palpably in excess of legislative power.

"The lawmaking bodies have in the past endeavored to promote free competition by laws aimed at trusts and monopolies. The consequent interference with private property and freedom of contract has not availed with the courts to set these enactments aside as denying due process. Where the public interest was deemed to require the fixing of minimum prices, that expedient has been sustained. If the lawmaking body within its sphere of government concludes that the conditions or practices in an industry make unrestricted competition an inadequate safeguard of the consumer's interests, produce waste harmful to the public, threaten ultimately to cut off the supply of a commodity needed by the public, or portend the destruction of the industry itself, appropriate statutes passed in an honest effort to correct the threatened consequences may not be set aside

because the regulation adopted fixes prices reasonably deemed by the Legislature to be fair to those engaged in the industry and to the consuming public.''

We recognize that there are differences between the statute involved in the *Nebbia Case* and Chapter 80 here being considered, as well as differences in the kind of commodity there dealt with. In fact, the court in that case said: ''The fluid milk industry is affected by factors of instability peculiar to itself which call for special methods of control.'' However, the statute there considered went further than Chapter 80. It fixed a definite minimum price of milk, a sale below which was made a crime regardless of the intention of the seller. Under Chapter 80 it is only unlawful to sell below the minimum when done for the purpose of injuring or destroying competition. (*Great Atlantic & Pac. Tea Co.* v. *Ervin,* (D. C.) 23 Fed. Supp. 70; *Balzer* v. *Caler,* 11 Cal. (2d) 663, 82 Pac. (2d) 19; *State* v. *Langley,* (Wyo.) 84 Pac. (2d) 767.) We rely upon the *Nebbia Case* only so far as it declares the broad police powers of the states. It is definite authority that a price-fixing statute may be valid if justification for it is found in a desire upon the part of the legislature to curb an evil affecting the public interest so as to fall within the police power of the state. The purpose of protecting the general public against monopolies is within the police power of the state.

The Act in question must be sustained as within the police power of the state if its provisions are reasonably designed to accomplish the purpose sought to be achieved, namely, that of protecting the public against monopolies. (Compare *State* v. *Safeway Stores,* 106 Mont. 182, 76 Pac. (2d) 81.)

The Minnesota statute involved in *Great Atlantic & Pac. Tea Co.* v. *Ervin,* supra, has the same effect as our Chapter 80, and the court in that case said: ''The object sought to be accomplished by the legislation with which we are concerned is the prevention of the sale of goods, wares, and merchandise in the state of Minnesota at prices less than cost, with the intent and purpose on the part of the vendor of injuring his competitors and destroying or lessening competition. That the Legislature of

the state of Minnesota might reasonably believe that such sales, made for such a purpose, tend to injuriously affect fair competition and to encourage monopoly and are opposed to the general public welfare and should therefore be curbed, we think is not to be seriously doubted. While we have no reason to believe that there is a dearth of grocers or other merchants in the state of Minnesota or a lack of competition among them or a present threat of monopoly in the grocery business, we are of the opinion that the state of Minnesota was free to adopt the public policy declared by the Legislature in this statute.'' The court further said: ''We shall concern ourselves only with determining whether the means provided by the statute for the enforcement of the policy adopted are consistent with the requirements of due process, or are unreasonable, arbitrary, capricious, and without a real and substantial relation to the object sought to be attained, and therefore violative of the due process clause or the equal protection clause of the Fourteenth Amendment [U. S. C. A. Const.].'' The court then condemned certain portions of the statute. The first paragraph of section 2, Part 2, Laws Minnesota 1937, Chapter 116, which is identical with the first paragraph of our section 3, seems to have been sustained by the court, but since the other provisions of the Act were held unconstitutional, the court held there was no method of enforcing it, and, hence, that the whole Act fell. The portions held unconstitutional in that case were so essentially different from our Chapter 80 that the case does not militate against our view that Chapter 80 is valid.

That the Act does not conflict with the federal or state Constitution, as a denial of due process of law, is so ably treated by the supreme court of Wyoming in the case of *State* v. *Langley,* supra, and by the supreme court of California in *Wholesale Tobacco Dealers Bureau* v. *National Candy & T. Co.,* supra, that we shall not repeat what was there said. We are satisfied with the conclusion reached in those cases.

We cannot say that the means employed by the statute are not adapted to accomplish the purpose of the Act. The legislative determination on the point is conclusive upon the

courts in the absence of a palpable abuse of power. (Compare *Old Dearborn D. Co.* v. *Seagram-Distillers Corp.*, supra; *State* v. *Safeway Stores*, supra.) By section 16 of the Act it is declared to be an urgency measure necessary for the immediate preservation of the public peace, health and safety, and the reasons why it was deemed necessary are specifically set out. Also by section 14 the legislature declared that the purpose of the Act is to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition. Furthermore, as was said by the supreme court of California in *Wholesale Tobacco Dealers Bureau* v. *National Candy & T. Co.*, supra: "It should also be mentioned that some 14 states have passed similar legislation [Unfair Practices Acts]. This is entitled to some weight in determining whether the means provided in the statute will tend to accomplish the valid and expressed purpose of the legislature."

Complaint is made of section 5 of the Act, which provides in ▉▉ substance that where a particular trade or industry of which the person complained of is a member has an established cost survey for the locality in which the offense is committed, the cost survey shall be competent evidence against the person complained of. This statute, it should be noted, simply establishes the admissibility of such evidence. It does not purport to prescribe the weight or credibility to be given to the evidence, as did the statute which was condemned on this ground in *Great Atlantic & Pacific Tea Co.* v. *Ervin*, supra. Also, there were in the Minnesota statute other features, not in ours, upon which the court rested its conclusion as to the invalidity of the cost survey provisions. Rules of evidence are subject to legislative control so long as defendant is given a fair and impartial trial and so long as no constitutional limitation is violated. (*State* v. *Pippi*, 59 Mont. 116, 195 Pac. 556.) If a defendant's business is, because of peculiar circumstances, not fairly to be governed by the cost survey, he is privileged to so show. The statute cannot be condemned on this ground.

The only other contention made is that section 3 is so in-▉▉ definite and uncertain in its provisions that it cannot be known when a person is, and when he is not, violating the law.

The chief contention in this respect is that the cost of an article including, as the statute requires, the cost of doing business cannot be ascertained under the terms of the statute. Defendants rely upon the case of *H. Earl Clack Co.* v. *Public Service Com.*, supra. As to the soundness of the rule there can be no doubt. The question here, however, is whether the rule is transgressed by the statute. The statute is no more indefinite than that held sufficiently definite in *Old Dearborn D. Co.* v. *Seagram-Distillers Corp.*, supra. In that case the phrase ''fair and open competition'' was held by the United States Supreme Court to be sufficiently definite so that no one need be misled as to its meaning or suffer by reason of any uncertainty. On this point we agree with what the learned Justice who wrote the opinion in the case of *State* v. *Langley,* supra, said: ''Hence, in the absence of provisions to the contrary, we must presume that the legislature did not intend to prescribe that the cost must be absolutely exact, and that it must be based upon the precise method of accounting which any one merchant might adopt, but meant, by 'cost,' what business men generally mean, namely, the approximate cost arrived at by a reasonable rule. Hence, if a particular method adopted by a merchant cannot, under the facts disclosed, be said to be unreasonable, and does not disclose an intentional evasion of the law, the method so adopted should be accepted as correct. In other words, all that a man is required to do under the statute is to act in good faith. (*Hygrade Provision Co.* v. *Sherman,* 266 U. S. 497, 45 Sup. Ct. 141, 69 L. Ed. 402.) In that view of the case, the standard set by the legislature is virtually reduced to one of 'reasonableness.' And it is held that 'reasonableness' as 'the standard of an Act, which can be determined objectively from circumstances, is a common, widely-used, and constitutionally valid standard in law.' (*People* v. *Curtiss,* 116 Cal. App. (Supp.) 771, 300 Pac. 801, 805, and cases cited.)''

Finding defendants' contentions to be without merit, the judgment is affirmed.

MR. CHIEF JUSTICE JOHNSON and ASSOCIATE JUSTICES MORRIS, STEWART and ERICKSON concur.