MAY'S DRUG STORES, INC., appellee, v. STATE TAX COMMISSION et al., appellants.

No. 47696.

(Reported in 45 N.W.2d 245)

320

DECEMBER 12, 1950.

REHEARING DENIED FEBRUARY 9, 1951.

Robert L. Larson, Attorney General, Henry W. Wormley, Assistant Attorney General, Don G. Mullan, of Odebolt, William W. Crissman, County Attorney, and Clewell & Cooney, of Dubuque, for appellants.

A. W. Bass, of Cedar Rapids, and Harold B. Claypool, of Williamsburg, for appellee.

MULRONEY, J.—In this declaratory judgment action there is presented the question of the constitutionality of the Iowa Unfair Cigarette Sales Act, chapter 226, Laws of the Fifty-third General Assembly (now chapter 551A, Code, 1950). Some pleading questions were raised and are here argued. We have examined them but do not feel they present a barrier to our reaching the main question as to the constitutionality of the Act. Because of the importance of the matter to the public the pleading questions will be passed and we will take up the question of the validity of the statute.

The Act in question forbids the sale of cigarettes by a retailer or wholesaler at less than cost. The plaintiff, May's Drug Stores, Inc., of Cedar Rapids, is engaged in the business of selling cigarettes at wholesale and retail. In its petition it claims the right to sell cigarettes at less than cost to it and the petition asserts the Act in its penal and enforcement provisions is violative of section 1, Article I, of the Constitution of Iowa, and the due process clauses of the Federal and State Constitutions. The prayer is for a declaration that the Act is unconstitutional.

The State Tax Commission, charged under the Act with much of the duty of enforcement, and the other law-enforcing officers who are named defendants, filed an answer admitting a controversy exists between plaintiff and defendants and, in substance, allege the Act when properly construed is constitutional. The trial court treated the issue as one of law, raised by the pleadings. There was some evidence tending to show the tax and license revenues of the state from the sale of cigarettes have been increasing during the past several years. The trial court viewed this evidence as of very slight, if any, importance and on the law issue raised he held the statute unconstitutional. Defendants appeal.

I. No one at this date questions the right of the legislature to enact measures, under its police power, that are designed to prohibit Acts which threaten free competition. In 1912 Justice Evans, speaking for this court in State v. Fairmont Creamery Co., 153 Iowa 702, 709, 133 N.W. 895, 898, 42 L. R. A., N. S., 821, said:

"One of the great legislative problems of the day is to protect fair competition * * *."

Such topics as Fair Trade, Unfair Discrimination, and Unfair Competition, will be found in the Codes of all but three or four states and in the Code of the United States. Under these topics will be found a wealth of laws, all expressive of the legislative thought that our economy is built upon trade; that free competition is the life of trade; and that which threatens its existence or tends to create a monopoly should be prohibited in the interest of public welfare. Many of these laws made that inevitable trip through the courts and, whether their validity was sustained or not, the courts always recognized that the promotion of free competition was a proper legislative endeavor under the police power. Just a few quotations will suffice to show the attitude of the courts on the general power of lawmaking bodies to enact measures to keep competition free.

"That the prevention of monopolies and the fostering of free, open and fair competition and the prohibition of unfair trade practices is in the public welfare is obvious, and requires no further citation of authority." Wholesale Tobacco Dealers Bureau v. National Candy & Tobacco Co., 11 Cal. 2d 634, 646, 82 P.2d 3, 10, 118 A. L. R. 486, 494.

" 'Exhibited is a clear legislative intent to prevent the destruction of local produce dealers through unfair discrimination by competitors more amply buttressed with capital. Monopolies gained through the misuse of an economic advantage to the direct injury of small merchants and the ultimate injury of producing and consuming classes are to be forestalled. That the police power of the state may be exerted to this end is not to be doubted.' " State v. Lanesboro Produce & Hatchery Co., 221 Minn. 246, 250, 21 N.W.2d 792, 794, 163 A. L. R. 1108, 1111.

"We have no hesitancy in holding that, generically, legislation prohibiting unfair competition and preventing acts which stifle competition is well within the surveyed limits of the police power." People v. Kahn, 19 Cal. App.2d 758, 764, 60 P.2d 596, 599.

"Legislation to foster free competition and to prevent monopolies is quite uniformly sustained." Rust v. Griggs, 172 Tenn. 565, 572, 113 S.W.2d 733, 735.

II. With the premise accepted that it is in the interest

of general welfare to protect free competition, the court's only inquiry is whether the measure adopted bears a reasonable relation to the legislative purpose of protecting free competition and is not arbitrary or discriminatory. Nebbia v. People of State of New York, 291 U. S. 502, 54 S. Ct. 505, 78 L. Ed. 940, 89 A. L. R. 1469.

That this law prohibiting sales of cigarettes below cost embodies a widespread conviction that such sales are destructive of free competition appears from the fact that about thirty states have enacted such laws. 118 A. L. R. 506; 128 A. L. R. 1126; 30 Minnesota Law Review 559; Blum v. Engelman, 190 Md. 109, 57 A.2d 421. The text writer in 118 A. L. R., at page 508, states:

"Thus far the courts have agreed that statutory provisions prohibiting sales below cost, where enacted for the purpose of preventing monopolies and fostering fair competition, have a constitutional object within the police power of the state to preserve and promote the general welfare."

In Serrer v. Cigarette Service Co., 148 Ohio St. 519, 522, 76 N.E.2d 91, 93, the Supreme Court of Ohio found it necessary to hold Ohio's Unfair Cigarette Sales Act (General Code, section 6402–10 et seq.) unconstitutional, but in the opinion Judge Zimmerman of that court observed that, "in this day and age [1947] it can hardly be urged that legislative bodies in the exercise of the police power may not, in the public interest and in the promotion of economic stability, prohibit sales at below cost * * *."

III. Courts generally have recognized that one of the revealed purposes of legislation prohibiting sales below cost is to save the small independent merchant who cannot afford to sell below cost and is unable to compete with stores that do. With the small independent merchant driven from the field the way is open for the establishment of a monopoly.

In Carroll v. Schwartz, 127 Conn. 126, 129, 14 A.2d 754, 756, the court said: "It is possible, unless restrained by law, for a powerful merchandiser with large resources to continue to sell at a loss in a community and thereby drive weaker competitors out of the market, establish a monopoly, and mulct the public."

This thought runs through most all of the opinions involving statutes prohibiting sales below cost. The California Supreme Court in Wholesale Tobacco Dealers Bureau v. National Candy & Tobacco Co., 11 Cal.2d 634, 650, 82 P.2d 3, 13, 118 A. L. R. 486, 497, saw some other objections to sales below cost, the opinion stating:

"The use of 'loss leaders' for the purpose of injuring a competitor has been condemned by many economists. It has been urged that their use is injurious to the consumer in that the losses so sustained will either have to be made up by higher prices charged on other commodities, or by the enforcing of various economies, such as the lowering of wages, discharge of employees, lowering of rents, depressing the wholesale prices, etc. It has many times been urged that such practices are destructive of competition and tend to create monopolies."

In State v. Langley, 53 Wyo. 332, 351, 84 P.2d 767, 774, the Wyoming Supreme Court, in upholding the constitutionality of that state's law prohibiting sales below cost, said:

"Great aggregations of wealth control much of the merchandising field of today. It is not necessary to say that that is an evil. We may even admit that it is a benefit. At the same time we still have with us the independent merchants. They, too, of course, are subject to the prohibition of the statute, but it was probably intended mainly for their benefit. They have hitherto been considered as part of the 'backbone' of every community, radiating their influence throughout the length and breadth of the state, maintaining, not alone fair competition, but adding to, and upholding, the moral fibre of the communities, upon which, in the long run, the existence of the commonwealth depends. The legislature has the right, we think, to give them a fair chance in the field of competition; to give them a chance to remain a pillar of support, thus at the same time giving an opportunity for the maintenance of individualism, still of importance in our day, and which, except for such legislation, might be entirely crushed."

See also Rust v. Griggs, 172 Tenn. 565, 113 S.W.2d 733; Associated Merchants of Montana v. Ormesher, 107 Mont. 530, 86 P.2d 1031.

The basic theory on which such legislation as is here involved rests was long ago announced by the legislature of this state. In 1906 the Iowa legislature, for reasons which we presume were sufficient, passed its first "Unfair Discrimination" Act (chapter 169, Acts of the Thirty-first General Assembly). The Act prohibited certain business practices of distributors of petroleum products. It branded as unfair and made criminal the act of such a distributor in selling at a lower price in one community than it sold in another for the purpose of driving a competitor out of business. The historical background of an oil company that once dominated that industry is well-known.

Next it was a few produce companies with many produce purchasing stations located throughout the land that began to dominate the produce business. When these produce companies discriminated in their prices by raising their price in one community to drive a financially weaker competitor out of business the Thirty-third Iowa Legislature passed chapter 222 (now section 551.2, Code, 1950) which prohibited and made criminal such price discrimination.

The two laws differed not at all in principle. In both the discriminatory business practice—one case selling and one case buying—would, as the legislature no doubt saw, enable the big company, with far-flung business outlets, to pick off its weaker competitors one by one.

This court recognized the evil present in the discriminatory practice. In upholding the constitutionality of the above law prohibiting discriminatory prices in produce buying, Justice Evans in the Fairmont Creamery Company case at page 710 of 153 Iowa, page 898 of 133 N.W., said:

"The particular methods which are condemned by the legislative act under consideration are set forth therein. It is quite manifest that a company sufficiently large in its capital and in the scope of its business could obtain a monopoly for itself in whatever territory it chose, by adopting the methods which are enumerated and prohibited in the statute."

The basic purpose of such antidiscriminatory statutes and the one here involved is the same. Again the legislature is aiming at pricing tactics which those who are well-armed with financial

resources can resort to in order to drive weaker competitors out of business. Today chain stores and chains of supermarkets occupy a dominant position in the retail market places of our country. A single company with large financial resources, owning thousands of stores or supermarkets, can sell below cost in one area and by that business practice drive its weaker competitors in that area out of business.

The words of Justice Evans, written nearly forty years ago in the Fairmont Creamery Company case concerning discriminatory business practices, are applicable today with reference to sales below cost. There he said (local citation above) :

"The temporary maintenance of artificial prices for the sole purpose of destroying a weaker competitor and creating a monopoly is one of the modern evil inventions. All that is required for its sure success is that there be great inequality of financial resources in favor of the offending party. * * * The magnitude of their operations is limited only by the magnitude of their resources.. The motive to monopolize is present as well as the ability to reap its fruits when acquired."

IV. In concluding that the legislature has the power to act on the subject matter of sales below cost and their impact on free competition we of course make no determination as to the wisdom of such laws. That is an economic question which this court is not free to decide. Nebbia v. People of State of New York, 291 U. S. 502, 537, 54 S. Ct. 505, 516, 78 L. Ed. 940, 957, 89 A. L. R. 1469, 1483; Wholesale Tobacco Dealers Bureau v. National Candy & Tobacco Co., supra.

In the Nebbia case, Mr. Justice Roberts, speaking for the United States Supreme Court, said :

"With the wisdom of the policy adopted, with the adequacy or practicability of the law enacted to forward it, the courts are both incompetent and unauthorized to deal. The course of decision in this court exhibits a firm adherence to these principles. Times without number we have said that the legislature is primarily the judge of the necessity of such an enactment, that every possible presumption is in favor of its validity, and that though the court may hold views inconsistent with the wisdom

of the law, it may not be annulled unless palpably in excess of legislative power."

In the Wholesale Tobacco Dealers Bureau case, the exhaustive opinion where the Supreme Court of California upheld the constitutionality of that state's law prohibiting sales below cost, it is held the "economic wisdom" of such a law is not for the courts. The court recognized there were arguments for and against such a regulation as an economic measure but held it was not the province of the court "to determine where the truth of this argument lies." The court observed it was enough that the subject is "fairly debatable" and the holding that it was fairly debatable rendered the legislative determination conclusive on the courts.

V. Section 3 of our Act (section 551A.3, Code, 1950) provides as follows:

"1. It shall be unlawful for any wholesaler or retailer to offer to sell, or sell, at wholesale or retail, cigarettes at less than cost to such wholesaler or retailer, as the case may be, as defined in this chapter. Any wholesaler or retailer who violates the provisions of this section shall be guilty of a misdemeanor and be punishable by fine of not less than one hundred dollars, nor more than five hundred dollars.

"2. Evidence of advertisement, offering to sell, or sale of cigarettes by any wholesaler or retailer at less than cost to him as defined by this chapter shall be evidence of a violation of this chapter."

■ It is asserted the Act and particularly the above quoted section violates section 1, Article I, of the state Constitution which preserves to all men the "inalienable" right of "possessing and protecting property." The argument is that the right of the owner to sell property at any price he sees fit is a valuable property right—one that is inherent in property ownership—and the above constitutional provision preserves this right to plaintiff and the Act in question seeks to take it away. But this is not a complete answer to the question of constitutionality. The above constitutional provision gives no right to own property as such, free from regulation.

The property rights preserved by the above constitutional provision are subject to the higher and greater right known as the public welfare. Stoner v. Iowa State Highway Comm., 227 Iowa 115, 287 N.W. 269; State v. Osborne, 171 Iowa 678, 154 N.W. 294, Ann. Cas. 1917E 497. The property right which is secured by this section of the Constitution is the pre-existing common-law right, and both this section and the due process clause, next to be considered, exclude arbitrary restrictions on property rights. State ex rel. English v. Ruback, 135 Neb. 335, 281 N.W. 607. As said in 16 C. J. S., Constitutional Law, section 209, page 611: "The police power is an incident of title to private property, and it is no objection to its reasonable exercise that private property is impaired in value or otherwise adversely affected."

See also City of Des Moines v. Manhattan Oil Co., 193 Iowa 1096, 1103, 184 N.W. 823, 826, 188 N.W. 921, 23 A. L. R. 1322, 1328, where Justice Weaver, speaking for this court, said:

"With the changing conditions necessarily attendant upon the growth and density of population, and the ceaseless changes taking place in method and manner of carrying on the multiplying lines of human industry, the demand becomes greater upon that reserve element of sovereignty which we call the police power, for such reasonable supervision and regulation as the state may impose, to insure observance by the individual citizen of the duty to use his property and exercise his rights and privileges with due regard to the personal and property rights and privileges of others. See Carr v. State, 175 Ind. 241, 93 N.E. 1071; State v. Mountain Timber Co., 75 Wash. 588. Such duty, even though it involves restriction upon the so-called natural rights of every individual, is the first and most imperative obligation entering into what we call the social compact. Without it there can be no such thing as organized society or civilized government."

VI. Section 9, Article I, of our Constitution provides that "no person shall be deprived of life, liberty, or property, without due process of law." And section 1 of the Fourteenth Amendment to the Federal Constitution prohibits a state from

depriving "any person of life, liberty, or property, without due process of law."

Plaintiff argues that the Act in question offends against the above due process clauses. As we have seen, the Act in question is an exercise of the police power. It has frequently been held that a statute emanating from the police power is not a denial of due process within the above constitutional provisions unless the legislation is an arbitrary, unreasonable or improper use of such power. Burlington and Summit Apts. v. Manolato, 233 Iowa 15, 7 N.W.2d 26, 144 A. L. R. 251, and cases there cited.

VII. We come now to plaintiff's main argument as to the unconstitutionality of the Act in question. Plaintiff concedes the legislature's general right under the police power to enact measures to promote free competition and that such measures could prohibit sales below cost, but, plaintiff argues, the prohibition against sales below cost must be confined to prohibiting such sales when made with intent to injure competitors or destroy competition or else it is unreasonable and an abuse of the police power. The argument proceeds to point out that our Act has no such limitation and is therefore an improper use of the police power which results in a denial of due process. The trial court sustained this argument and held the statute unconstitutional.

VIII. Defendants' first argument is that properly construed the statute is limited to prohibiting sales when intended to injure a competitor or destroy competition. The argument is based on a premise that the statute is ambiguous and resort can therefore be made to the preamble of the Act where there is this recitation: "WHEREAS, offering for sale, or sale of cigarettes below cost in the wholesale and retail trade with intent to injure competitors, destroy or lessen competition, is deemed an unfair and deceptive business practice."

The argument is unsound in its first premise. The statute is not ambiguous. Defendants suggest an ambiguity exists because of the wording of paragraphs 1 and 2 in section 551A.3, previously quoted. Paragraph 2 does seem redundant. Paragraph 1 says the offer to sell, or sell at less than cost will be a violation and paragraph 2 states "evidence of advertisement, offering to sell, or sale * * * shall be evidence of a violation." Perhaps paragraph 2 is superfluous but we see no ambiguity that

presents a judicial choice of construction. Paragraph 2 might have some effect in that it makes "advertisement" evidence of the offense. The argument that paragraph 2 would not be superfluous if we supplied the element of intent in paragraph 1 is not impressive. Neither would it exist if paragraph 1 limited the offense to sales which had the "effect" of destroying competition —a limitation present in many statutes prohibiting sales below cost. The statute is not ambiguous. Resort cannot be had to the preamble to construe the statute as limited to barring sales intended to injure competitors or destroy or lessen competition. State v. Linsig, 178 Iowa 484, 159 N.W. 995. The statute prohibits offers to sell and sales of cigarettes below cost regardless of the intent of the offerer or seller.

IX. So the question comes down to whether this statute is rendered unconstitutional because it fails to require as an element of the offense that sales below cost be made with the intent to injure a competitor or destroy or lessen competition. And we can add to the question: because it fails to require as an element of the offense that the sales below cost have the effect of destroying competition—though plaintiff does not specifically argue this latter point. One or both elements, which we will call intent and effect, are present in the definition of the offense in most all of the statutes prohibiting sales below cost that have been held constitutional.

X. We see no good reason to support the argument that intent must be a necessary element in order to save the constitutionality of the statute. The legislature is prohibiting an act, a business practice, declared to be destructive of competitors and free competition. The state of mind of the doer of the act is immaterial. The question whether the regulation bears a reasonable relation to the legislative purpose of protecting and promoting free competition turns upon the act or business practice prohibited and whether that act or business practice can reasonably be thought destructive of free competition. We see no dividing line which would say due process is served if the profitless sale with intent to injure either a competitor or free competition is prohibited and denied if that motive is not present. The legislature is not condemning a state of mind. McIntire v. Borofsky,

95 N. H. 174, 59 A.2d 471. The ban of the statute operates upon the act.

The law is full of instances of police power measures that prohibit the doing of certain acts without specifically providing the doer must be motivated by an intent to injure, or any specific intent. In the following cases state statutes prohibiting sales below cost which did not specifically require the presence of the element of intent to injure either a competitor or free competition were upheld: McIntire v. Borofsky, 95 N. H. 174, 176, 59 A.2d 471, 473: "The legislature deemed it necessary to do more than condemn a state of mind"; McElhone v. Geror, 207 Minn. 580, 585, 292 N.W. 414, 417: "Intent to injure is not essential to violation. This is not fatal to the act"; Rust v. Griggs, 172 Tenn. 565, 113 S.W.2d 733; Hill v. Kusy, 150 Neb. 653, 35 N.W.2d 594.

The intent to injure a competitor or destroy competition is not made a necessary element in such statutes as the Clayton Act (15 U. S. C. A., sections 12–27)' as amended in 1936 by the Robinson-Patman Act (15 U. S. C. A., section 14) prohibiting discrimination between purchasers where the effect "may be to substantially lessen competition or tend to create a monopoly * * *."

In State v. Lanesboro Produce & Hatchery Co., 221 Minn. 246, 260, 21 N.W.2d 792, 798, 163 A. L. R. 1108, 1116, a statute making it unlawful to discriminate by purchasing farm products at a higher price in one locality than another was challenged as denying due process on the ground that the law omitted the element of intent to destroy competition from the definition of unfair discrimination which was prohibited and declared unlawful. In upholding the constitutionality of the Act the Minnesota Supreme Court said:

"The statute in question omits the element of intent to destroy competition from the definition of unfair competition. So did the statute passed upon in the Fairmont Creamery Company case. The United States court commented on the fact that (274 U. S. 1, 8, 47 S. Ct. 506, 508, 71 L. Ed. 897, 52 A. L. R. 167) 'the inhibition of the statute applies irrespective of motive,' but it did not hold the statute unconstitutional on the ground that

it violated the due process provision of the constitution in that it omits the element of intent to destroy competition from the definition of the offense of unfair discrimination. In United States v. Balint, 258 U. S. 250, 42 S. Ct. 301, 66 L. Ed. 604, the court held that whether scienter is a necessary element in a statutory crime, though not expressed in the statute, is a question of legislative intent to be answered by a construction of the statute. It further held that punishment for an illegal act done by one ignorant of the facts making it illegal is not contrary to due process of law. The court said (258 U. S. 252, 42 S. Ct. 302, 66 L. Ed. 605): '* * * it has been objected that punishment of a person for an act in violation of law when ignorant of the facts making it so, is an absence of due process of law. But that objection is considered and overruled in Shevlin-Carpenter Co. v. Minnesota, 218 U. S. 57, 69, 70, 30 S. Ct. 663, 666, 54 L. Ed. 930, in which it was held that in the prohibition or punishment of particular acts, the State may in the maintenance of a public policy provide "that he who shall do them shall do them at his peril and will not be heard to plead in defense good faith or ignorance." Many instances of this are to be found in regulatory measures in the exercise of what is called the police power where the emphasis of the statute is evidently upon achievement of some social betterment rather than the punishment of the crimes as in cases of *mala in se*. [Citing cases.]' "

XI. Closely akin to the question of the necessity of intent as an element of the offense is the question of the necessity that the act prohibited have the *effect* of injuring a competitor or destroying competition. In the cases cited in the last division the statutes prohibiting sales below cost, which were upheld, required that either the intent to injure or the *effect* of injury on competition must be present. In Hill v. Kusy, supra, the Nebraska Supreme Court construed the phrase "with intent or effect" to mean "practically the same thing."

On the other hand, many of the statutes merely condemn the sale below cost with intent to injure a competitor or destroy competition without requiring that it have that result. State v. Langley, supra; Wholesale Tobacco Dealers Bureau v. National Candy & Tobacco Co., supra. In some twenty states prohibiting

sales below cost with intent to injure a competitor or destroy competition, or with that effect or result, the statutes, in various forms, provide that a prima facie case of violation arises from proof of the below-cost sale. 57 Yale Law Journal, pages 411, 412.

In State v. Lanesboro Produce & Hatchery Co., supra, previously discussed, the Minnesota antidiscrimination statute which was there upheld omits both elements of intent and effect. As we have previously pointed out, the ruling principle that governs in the antidiscrimination cases is the same as the ruling principle that should govern here.

The question of whether due process is satisfied in this police power measure is whether the means adopted—prohibition of all below-cost sales—is reasonable. As previously stated it is not rendered unreasonable because failing to limit the prohibition to below-cost sales *intended* to injure. And we feel it is not rendered unreasonable by failing to limit the prohibition to sales that can be shown to have the effect or result of injuring free competition. The legislative finding of the evils attributable to below-cost selling, the frequent connection between sales below cost and injury to competitors and free competition, and the difficulty of proving that connection in each case, justifies the flat prohibition without requiring a judicial finding that each particular below-cost sale has the effect or result of injuring a competitor or destroying competition. As the writer in the cited Yale Law Journal article pointed out, the limitation of intent and effect has practically vanished in those twenty states where the statutes provide that proof of below-cost sales or advertisements make out a prima facie case.

The fundamental policy of the legislation is that freedom of competition is desirable and whatever substantially lessens it or tends to create a monopoly is an evil. The legislature finds that, ordinarily, sales below cost injure competitors and destroy competition. That is sufficient justification for the prohibition of all such sales—at least in the absence of some showing that a substantial volume of sales below cost by dealers would not have such a result. Booth v. Illinois, 184 U. S. 425, 22 S. Ct. 425, 46 L. Ed. 623. As stated, the question as to whether the law should contain the "effect" limitation is the same question which the

courts must answer whenever a police power measure is challenged. Does the prohibitory regulation bear a reasonable relation to the public purpose it serves? If the ordinary and natural result of sales below cost is destructive of competition, then a regulation banning sales below cost is a reasonable regulation without the requirement that each particular sale be shown to be destructive of competition. It is possible that such a requirement limiting the ban might be necessary if a showing were made that only a few sales below cost were destructive of free competition. But it is permissible to strike down the business practice as a class when what is generally or ordinarily done in pursuing that business practice is pernicious and the evil cannot be successfully reached unless the entire business practice be prohibited. In Booth v. Illinois (at page 429 of 184 U. S., page 427 of 22 S. Ct.), cited with approval in City of Des Moines v. Manhattan Oil Co., 193 Iowa 1096, 1104, 184 N.W. 823, 188 N.W. 921, 23 A. L. R. 1322, the rule is stated:

"If, looking at all the circumstances that attend, or which may ordinarily attend, the pursuit of a particular calling, the State thinks that certain admitted evils cannot be successfully reached unless that calling be actually prohibited, the courts cannot interfere, unless, looking through mere forms and at the substance of the matter, they can say that the statute enacted professedly to protect the public morals has no real or substantial relation to that object, but is a clear, unmistakable infringement of rights secured by the fundamental law."

See also L. Maxcy, Inc. v. Mayo, 103 Fla. 552, 577, 139 So. 121, 131, where the opinion states: "* * * the Legislature may exercise its power to suppress an evil by prohibiting entirely a stated practice out of which that evil largely grows, even though by so doing, innocent acts may be forbidden * * *."

 The presumption of constitutionality continues until there is some showing that without the "effect" limitation the Act is unreasonable. Counsel's statements in argument, detailing some sales transactions below cost which might not be destructive of competition, will not overcome the presumption.

The Act exempts some sales below cost, such as an isolated transaction, a clearance sale, and the sale of damaged cigarettes.

Evidently the legislature felt such sales below cost would have little or no injurious effect on free competition. Because counsel can think of a few others is no basis for holding the statute an unreasonable regulation under the police power.

XII. The justification for banning all sales of cigarettes below cost is particularly compelling here where the legislature has limited the prohibition to the cigarette distribution industry. This distinguishes our statute from such statutes as the Pennsylvania and New Jersey statutes held unconstitutional in Commonwealth v. Zasloff, 338 Pa. 457, 13 A.2d 67, 128 A. L. R. 1120, and State ex rel. Lief v. Packard-Bamberger & Co., 123 N. J. Law 180, 8 A.2d 291. The statutes held unconstitutional in the above two cases were like ours in that they omitted intent and effect but they were general "loss leader" statutes applying to all merchandise sold below cost, while ours is confined to the cigarette distribution industry.

We know that the manufacturers of cigarettes have, through advertising and other means, built up a large consumer market; and that market is composed of persons who make frequent purchases. Their product bears well-advertised trade names and the general package prices of the different brands are quite well-known by consumers. Cuts in this general price to a point below cost is more conspicuous than would be similar cuts in the price of other commodities of which the general price is not so well-known. We have a right to assume that the legislature considered the cigarette distribution industry one where the practice of selling below cost was found to be especially prevalent; that a general cause-and-effect relationship existed between the general practice of selling cigarettes below cost and monopoly; and that this causal connection in a particular sale, below cost, of such a widely purchased commodity as cigarettes would be so difficult of proof as to render the protection of the statute of little value if such proof were required in each case.

XIII. The Act in question defines cost to a wholesaler or retailer as the "basic cost of cigarettes" to the wholesaler or retailer plus his "cost of doing business." "Basic cost" is either invoice or replacement cost, whichever is lower. And "cost of doing business" is presumed to be four per cent of the basic cost of the cigarettes for a wholesaler and eight per cent of such cost

for the retailer "in the absence of proof of a lesser or higher cost." (Section 551A.2, pars. 8, 9a, 9b, 10a, 10b, Code, 1950.) Other sections of the Act provide that in determining cost to the wholesaler or retailer certain evidence shall be admissible and that where a "cost survey pursuant to recognized statistical and cost accounting practices has been made for the trading area" such survey shall be admissible to establish actual cost to the wholesaler or retailer complained against. Section 551A.8, Code, 1950. The Act also provides that the State Tax Commission "is empowered to and may" make such cost surveys for the state or such trading areas. Section 551A.11, Code, 1950.

Plaintiff argues the definition of cost is so vague that the entire Act is rendered indefinite and uncertain. The argument is that this is a criminal statute providing for penalties for those who sell below cost and the cost formula furnished is so indefinite that it would be a violation of due process to require compliance with such an indefinite standard in order to avoid the penalties of the Act.

It is the law that a "statute creating and defining an offense * * * must fix a standard of guilt with reasonable certainty." 16 C. J. S., Constitutional Law, section 580. The statute forbids the sale below cost and defines cost to be invoice or replacement cost plus the "cost of doing business." The invoice or replacement cost is sufficiently definite. The seller knows or can easily determine this figure. As to the cost of doing business the Act (now subsections 9b and 10b of 551A.2, Code, 1950) states:

"The cost of doing business by the wholesaler is presumed to be four percent of the basic cost of said cigarettes in the absence of proof of a lesser or higher cost, plus cartage to the retail outlet, if furnished or paid for by the wholesaler. Such cartage cost is presumed to be one-half of one percent of the basic cost of the cigarettes in the absence of proof of a lesser or higher cost. * * * The cost of doing business by the said retailer is presumed to be eight percent of the basic cost of cigarettes in the absence of proof of a lesser or higher cost."

As we read the statute it provides for any reasonable method of cost accounting which a dealer in good faith applies to his business. That this is the legislative intent is indicated by section

551A.8, Code, 1950, which states in part that "in determining cost to the wholesaler and cost to the retailer the court shall receive and consider as bearing on the *bona fides* of such cost" certain evidence that the person complained against purchased cigarettes at a "fictitious price" or in some manner that would conceal the *"true cost."* (Italics supplied.) Bona fides or good faith is the opposite of mala fides or bad faith and any system that is not resorted to for the purpose of evading the law will satisfy its requirements.

No evidence as to accounting practices generally or as to plaintiff's accounting system was introduced. We recognize that there may be different systems. But we also know that in these days of income taxes every merchant applies some system of accounting to his business. In Rieder v. Rogan, 12 F. Supp. 307, 318, the court took judicial notice of the accuracy of modern systems of accounting and said: "It would seem to us that, with the high development of cost accounting at the present time [1935], it should not be difficult to trace that initial cost."

In State v. Bevins, 210 Iowa 1031, 1042, 230 N.W. 865, 870, the defendant was prosecuted under a statute providing penalties for receiving a bank deposit while knowing of the "insolvency" of the bank. Upon appeal from conviction the defendant maintained "that the words 'insolvent' and 'insolvency,' as used [in the law], are so indefinite and uncertain as to be no guide to conduct in the banking world. * * * that these words are 'incapable' of accurate definition and determination * * * [and therefore] 'no ascertainable standard of guilt or innocence is fixed.' "

We held the regulation was practical and susceptible of understanding and stated (page 1045):

"Statutes of this kind have been very generally adopted by the legislatures of the various states, and, as thus enacted, have been widely enforced. Under statutes of this kind, something may be left to the judgment of the banker. Possibly there is an element of estimation involved, when determining solvency or insolvency. This alone, however, will not defeat the statute. Nash v. United States, 229 U. S. 373; Omaechevarria v. State of Idaho, 246 U. S. 343; Hygrade Provision Co. v. Sherman, 266 U. S. 497."

A cost-of-doing-business formula, much like the one present in our Act, in the Wyoming statute prohibiting sales below cost was upheld in State v. Langley, 53 Wyo. 332, 365, 84 P.2d 767, 779. The following language from that opinion, which meets with our approval, has often been quoted to sustain the constitutionality of similar provisions in statutes prohibiting sales below cost (see Associated Merchants v. Ormesher, 107 Mont. 530, 86 P.2d 1031; Dikeou v. Food Distributors Assn., 107 Colo. 38, 108 P.2d 529):

"Hence, in the absence of provisions to the contrary, we must presume that the legislature did not intend to prescribe that the cost must be absolutely exact, and that it must be based upon the precise method of accounting which any one merchant might adopt, but meant, by 'cost;' what business men generally mean, namely, the approximate cost arrived at by a reasonable rule. Hence, if a particular method adopted by a merchant cannot, under the facts disclosed, be said to be unreasonable, and does not disclose an intentional evasion of the law, the method so adopted should be accepted as correct. In other words, all that a man is required to do under the statute is to act in good faith. Hygrade Provision Co. v. Sherman, 266 U. S. 497, 45 S. Ct. 141, 69 L. Ed. 402. In that view of the case, the standard set by the legislature is virtually reduced to one of 'reasonableness.' And it is held that 'reasonableness' as 'the standard of an act, which can be determined objectively from circumstances, is a common, widely-used, and constitutionally valid standard in law.' People v. Curtiss, 116 Cal. App. (Supp.) 771, 300 P. 801, 805, and cases cited."

 XIV. Section 551A.7, par. 1, Code, 1950, provides that a wholesaler or retailer can sell cigarettes at a price "made in good faith" to meet the price of a competitor who is selling the same article "at the cost" to the competing wholesaler or distributor "as defined by this chapter." Paragraph 2 provides: "In the absence of proof of the actual cost to a competing wholesaler or to a competing retailer, as the case may be, such cost shall be the lowest cost to wholesalers or the lowest cost to retailers, as the case may be, within the same trading area as

determined by a cost survey made pursuant to section 551A.8, subsection 2."

The trial court said "the 'trade area' standard is so vague and indefinite that the merchant could have no means of ascertaining whether he was lawfully meeting competition or whether he had in his attempt to do so made himself liable to the provisions of Chapter 226."

This is merely one of the exemptions from the sale-below-cost prohibition. The legislature is not, in this section, defining the crime. It is of course an extremely important exemption for it recognizes what might be termed the first rule of all free competition—the right of any distributor to meet the legal price of his competitor. Without such an exemption the prohibition of the statute might be self-defeating in that it might be held to cut off essential rights of all competition and might therefore be unreasonable. State v. Fairmont Creamery Co., supra. Some of the courts have examined this exemption and have held the entire statute void for indefiniteness when the exemption is not clearly expressed or fails to set up a reasonably clear standard the merchant must follow when meeting the price of a competitor. Lief v. Packard-Bamberger & Co., supra. Many early statutes were declared arbitrary because they forced a distributor to determine whether his competitor's price was legal—something he could hardly do without examining his competitor's books. Commonwealth v. Zasloff, supra; State ex rel. Lief v. Packard-Bamberger & Co., supra. Gradually there emerged the rule of a good faith price to meet competition, and statutes which exempted sales below cost when made in good faith to meet competition were upheld. In McIntire v. Borofsky, 95 N. H. 174, 177, 59 A.2d 471, 474, it is stated:

"One of the exceptions to the Act is 'where the price of merchandise is made in good faith to meet legal competition.' Sec. 3(h). If this required the retailer to examine his competitor's books to ascertain whether the competition was legal, it would be of doubtful validity. Commonwealth v. Zasloff, 338 Pa. 457, 465, [13 A.2d 67, 128 A. L. R. 1120]. All that is required of the retailer, however, is an endeavor 'in good faith' to meet the legal prices of his competitor. People v. Pay Less Drug Store, 25 Cal. 2d 108, [153 P.2d 9]."

Good faith is all that is required of a distributor under the exemption to meet competition in our Act.

The trial court in that part of his opinion where this exemption is discussed, stated:

"The Code says that the cost shall be the lowest cost to wholesalers or to retailers, as the case may be, within the same trading area, as defined by cost survey made pursuant to section 8b. Assuming that a cost survey pursuant to recognized statistical and cost accounting practices, as referred to in section 8b, is sufficiently definite, there appears no way for the dealer desirous of meeting competition to know what the same trade area includes. Does it mean the city or town or county, or a radius from which customers normally come to the place in which the dealer is located to trade? Ordinarily customers of the tobacco trade do not travel far to buy their cigarettes or cigars only. Yet they may come to a particular city or town to do their shopping and while there purchase cigarettes. The 'trade area' standard is so vague and indefinite that the merchant could have no means of ascertaining whether he was lawfully meeting competition or whether he had in his attempt to do so made himself liable to the provisions of chapter 226."

There is no need to define the trade area by land space limits as a town, county or even the entire state. It is enough to say, as here used, the distributor's trade area embraces all of that area where his competitors are located. The statute allows a distributor acting in good faith to sell below cost to meet a competitor's price. This presupposes he will act in good faith in the determination of who is his competitor. So long as a distributor acts in good faith he establishes his own trading area limits.

The California statute, section 17050(d), provides the prohibition of sales below cost does not apply when the sales are made "in good faith to meet the legal prices of a competitor selling the same article or product, in the same locality or trade area and in the ordinary channels of trade." 2 Deering's Code (Business and Professions).

In sustaining this statute against the charge that it was so indefinite and uncertain as not to permit a person to under-

stand its meaning, the California Supreme Court, in People v. Pay Less Drug Store, 25 Cal.2d 108, 116, 153 P.2d 9, 14, said:

"They say that no one can tell what territory is embraced in 'the same locality or trade area.' * * * It is safe to assume that merchants generally know who are their competitors, and from what locality or trade area they draw their customers. The language complained of is shown in this case to be susceptible of practical application without more particular definition. Empirical surmises are not to be substituted for pragmatical results."

In McElhone v. Geror, 207 Minn. 580, 589, 292 N.W. 414, 419, the Minnesota Supreme Court said a retailer "will ordinarily know who his competitors are", and of the qualifying words in the Minnesota statute, " 'in the same locality or trade area' ", the court said: "Neither 'same locality' nor 'trade area' is a phrase of art, with precise meaning. * * * the statute is definite and certain, enough so, anyway, to fend off the present attack so far as it proceeds on the supposition that it is otherwise."

We are of the view the statute must be held free from the constitutional objections here urged. The judgment of the trial court is reversed and the cause is remanded for judgment in conformity with this opinion.—Reversed and remanded.

All JUSTICES concur.